In re the Matter of Michelle LEMOND, a Minor Child.

**Jeanene McCORMACK,**
**Petitioner–Appellant,**

v.

**Earl LEMOND, Respondent–Appellee.**

Supreme Court of Indiana No. 680 S 183.

Court of Appeals of Indiana
No. 1–1278A360.

Dec. 2, 1980.

David B. Hughes, Indianapolis, R. Stephen LaPlante, Evansville, Valentine J. Fleig, Petersburg, for petitioner–appellant.

William F. Harvey, Richard D. Wagner, Gary Price, David F. McNamar, Indianapolis, Mark K. Sullivan, Petersburg, Robert S. Colker, Asst. Atty. Gen., Richard L. Zweig, Sigmund J. Beck, Indianapolis, William J. Marshall, Oakland City, for respondent–appellee.

PER CURIAM.

### NATURE OF THE CASE

This cause is before the Supreme Court of Indiana and the Court of Appeals of Indi-

ana, First District, and Acting Chief Judge Staton of the Court of Appeals, on citations of indirect criminal contempt of these two Courts against the following respondents:

1. The Honorable James R. Arthur, Special Judge, Pike Circuit Court;

2. The Honorable William D. Richardson, Regular Judge, Pike Circuit Court;

3. Thomas C. Gray, attorney, Pike County, Indiana;

4. Jerry J. McGaughey, Prosecuting Attorney, Pike County, Indiana; and

5. Earl Lemond, Pike County, Indiana.

Each respondent is charged with willfully and intentionally violating an order of the Supreme Court and the mandate of the Court of Appeals entered in the appeal of a case decided under the Uniform Child Custody Jurisdiction Act (UCCJA), Ind. Code § 31–1–11.6–1 *et seq.* (Burns 1979 Supp.). *See In re Lemond*, (1979) Ind.App., 395 N.E.2d 1287, *trans. denied and trial court stay dissolved*, May 29, 1980.

A criminal contempt can be any act which manifests a disrespect for and defiance of a court. The willful and intentional disobedience of the orders of these Courts can constitute indirect criminal contempt. *In re Perrello*, (1973) 260 Ind. 26, 291 N.E.2d 698. *See Denny v. State*, (1932) 203 Ind. 682, 182 N.E. 313. One of respondents' contentions is that there was no intent to violate the orders of these Courts. Questions of intent and good faith in a case such as this are to be decided by these Courts after considering all the evidence. *In re Perrello, supra*, 260 Ind. at 30, 291 N.E.2d at 701. After hearings on these matters, respondents Arthur, Richardson, Gray and McGaughey were found to be in indirect criminal contempt of the Supreme Court of Indiana and the Court of Appeals of Indiana. Each was fined in the sum of five hundred dollars. Respondent Lemond was found not guilty. This opinion is in furtherance and support of the findings and orders of these Courts wherein the above named respondents were found to be in indirect criminal contempt.

## FACTS

For the sake of continuity, the basic facts from the prior decision of the Court of Appeals will be restated, together with the events that transpired after the Court of Appeals rendered its decision on October 30, 1979. In 1968, Earl Lemond (the father) and Jeanene McCormack (the mother) were married and living in Hawaii. On May 1, 1968, a daughter, Michelle, was born of this union. The marital relationship became strained, leading to a divorce *by consent decree* entered by a Hawaiian trial court on December 10, 1973. The decree provided that both parties were to have the "care, custody and control" of Michelle, but that Earl Lemond was to have physical custody of the child. The decree also established that, if either party changed residence from Hawaii to some other state, physical custody was to be awarded to the mother, Mrs. McCormack. After the divorce, both parents continued to live in Hawaii. Michelle usually spent several months each summer with various relatives in the Pike County area of Indiana.

In June, 1977, Earl Lemond returned from Hawaii to Pike County, Indiana, and established residence. Instead of returning Michelle to Hawaii at the end of the summer, in accordance with the divorce decree, the father enrolled Michelle in school in Pike County. At this point, the mother came to Indiana and surreptitiously secured Michelle's return to Hawaii. The father countered by bringing Michelle back to Indiana in May, 1978, while the mother was in Europe. The mother's next attempt to return Michelle to Hawaii was blocked by the father.

Thus, on May 19, 1978, Mrs. McCormack filed a petition for the enforcement of the Hawaiian decree in Pike Circuit Court, pursuant to Ind. Code § 31–1–11.6–1 *et seq.* (Burns 1979 Supp.), the Uniform Child Custody Jurisdiction Act (UCCJA). The father, Earl Lemond, responded by filing a petition to modify the Hawaiian decree.

The Honorable William D. Richardson, regular judge of the Pike Circuit Court, denied both petitions, but granted custody to the father.

On appeal, the Court of Appeals, First District, found that under the UCCJA, Hawaii was Michelle's home state. Specifically, the Court of Appeals stated:

"Without question, we believe Hawaii had jurisdiction under the Act when these proceedings commenced. As a general matter, it is clear to this court that while Michelle 'vacationed' during the summer months in Indiana her predominant place of abode was in Hawaii. More specifically, Michelle had lived with Mother for over six months in Hawaii immediately preceding this action; accordingly, Hawaii was her 'home state' (see Ind. Code § 31–1–11.6–2(5)) thereby conferring jurisdiction upon Hawaii tribunals under Ind. Code § 31–1–11.6–3(a)(1)(A). For these reasons, we hold the lower court erred in assuming jurisdiction. Ind. Code § 31–1–11.6–14."

*In re Lemond,* (1979) Ind.App., 395 N.E.2d 1287, 1291. The opinion of the Court of Appeals concluded with the following explicit mandate:

"For all the foregoing reasons, we reverse the decision of the trial court and *remand the case with directions to recognize the Hawaiian decree pursuant to sections thirteen and fifteen of the Act, and for further proceedings not inconsistent with the views stated herein.*"

*In re Lemond, supra,* 395 N.E.2d at 1292. Sections thirteen and fifteen of the UCCJA provide for the recognition and enforcement of out–of–state decrees as though they were Indiana decrees.

Soon after this decision was handed down by the Court of Appeals, counsel for the father petitioned the Pike Circuit Court to stay enforcement of the Court of Appeals mandate, pending further appeal. The Pike Circuit Court, by respondent Richardson, entered such a stay order, pending further proceedings in the Court of Appeals of Indiana, the Supreme Court of Indiana, and the Supreme Court of the United States.

On November 14, 1979, counsel for the father, pursuant to Ind.R.App.P. 11(A), filed a Petition for Rehearing. The mother filed petitions with the trial court and the Court of Appeals asking that the stay entered by respondent Richardson be dissolved. Each petition to dissolve the stay was denied. Subsequently, on December 4, 1979, the Court of Appeals denied rehearing.

Thereafter, Earl Lemond filed a timely Petition to Transfer, pursuant to Ind.R. App.P. 11(B). After reviewing the petition, the brief in support, and the brief in opposition, the Supreme Court of Indiana set the matter for oral argument, which was heard on April 21, 1980. On May 29, 1980, the Supreme Court first denied the father's petition to transfer, then also dissolved the stay previously entered by respondent Richardson.

■ On the same date, May 29, 1980, the Clerk of the Supreme Court and Court of Appeals sent notices to all counsel of record, informing them that the petition to transfer had been denied and the stay dissolved. In addition, the Clerk of these Courts certified the opinion of the Court of Appeals and transmitted the opinion to the Clerk of the Pike Circuit Court. *See* Ind.R.App.P. 15(B). The effect of the denial of transfer and dissolution of the stay was to make the Court of Appeals opinion the law of the case. *See Egbert v. Egbert,* (1956) 235 Ind. 405, 132 N.E.2d 910. Thus, all the issues directly decided by the Court of Appeals opinion were binding in further proceedings in this case. Hawaii had been found to be the home state for purposes of determining any further custody disputes, and that decision was not subject to further attack in Indiana. Accordingly, these Courts presumed and expected that the mandate of the Court of Appeals and the order of the Supreme Court would be honored in all respects and the child would be returned to her mother.

*Information to the Supreme Court and Court of Appeals.*

On Friday, June 13, 1980, these Courts were presented with an information,[1] filed by the mother, setting out the following facts which were later proven to be true. On or about June 4, 1980, the mother was advised that a writ of habeas corpus would be granted in the Pike Circuit Court and custody of Michelle finally delivered to her at approximately 9:00 a. m., on Friday, June 6, 1980.[2] Consequently, the mother flew from Hawaii to Indiana. Mrs. McCormack, with her two attorneys, Val Fleig and R. Stephen LaPlante, arrived in the Pike Circuit Court at the appointed hour to obtain custody pursuant to the orders of these Courts.

Respondent Judge William D. Richardson issued the writ of habeas corpus in Trial Cause 78 C 71 at approximately 9:00 a. m., but only on the condition that the mother would not execute on the writ until 1:00 p. m., that afternoon. The reason for this delay soon became clear; respondents had engaged in a great deal of maneuvering before 9:00 a. m., that morning. Judge Richardson informed Mrs. McCormack that a new proceeding had been initiated at 8:50 a. m., in the juvenile division of the Pike Circuit Court. According to the order book entry of the Pike Circuit Court, the newly filed petition, under cause number 80 J 20, alleged that Michelle Lemond was a child in need of services. While respondent Richardson indicated that he believed the new action to be an "end run," he did not dismiss the petition; instead, he disqualified himself from acting as judge in the juvenile action. A panel of judges apparently was named, but Mrs. McCormack was not told

of this procedure, despite being present in open court with her attorneys. A short time after Judge Richardson's disqualification, James R. Arthur, regular judge of the Daviess Circuit Court, appeared in the Pike Circuit Court, announced that he was the special judge, and assumed jurisdiction in cause number 80 J 20. Obviously, since Mrs. McCormack did not know of a panel being named, she also did not know how respondent Arthur became special judge.[3]

Even though no evidence was presented, and Michelle was not present in court, respondent Arthur specifically found that Michelle was in need of services and ordered a mental examination to be conducted by the Comprehensive Community Health Care Center of Vincennes, Indiana. Judge Arthur reasoned that Michelle should be *detained* to "determine her mental condition at this time and her probable condition in the future if she is compelled to remove herself to the State of Hawaii." The transcript of June 6, 1980, CHINS Hearing at 20. This finding and order were made over a motion to dismiss and an objection by counsel for the mother. Counsel correctly argued that the trial court lacked jurisdiction to do anything other than enforce the writ of habeas corpus, because the issue of custody had been decided by the Supreme Court and Court of Appeals, and because the Child in Need of Services (CHINS) action was clearly a sham. This argument was made to no avail. The child was ordered turned over to the Pike County Welfare Department, pending the mental examination ordered by respondent Arthur. Mrs. McCormack was, however, permitted a short visit with Michelle. The contempt information further alleged that a second hearing was conducted on June 11, 1980.

1. Initially, only respondents Arthur, Gray, McGaughey, and Lemond were cited to show cause why they should not be held in contempt of each of these Courts. Respondent Richardson was cited to show cause on August 26, 1980, after the other respondents had been found in contempt.

2. The evidence later revealed that it was respondent Gray who called Mrs. McCormack and advised her that she could pick up Michelle.

3. An affidavit filed by the prosecutor, respondent McGaughey, indicates that he struck one name and the Clerk of Pike Circuit Court struck the other. On the other hand, the docket sheet for 80 J 20 states that "the parties" struck names, but does not indicate which party struck which judge from the panel, nor even who the "parties" were. We shall more fully explore and discuss this striking procedure later in this opinion.

The mother renewed her motion to dismiss and objections at that time. Custody was still not returned to the mother.[4]

The Supreme Court and the Court of Appeals, having been presented with the foregoing information, found probable cause did exist to believe the named respondents had willfully and intentionally violated the mandate of the Court of Appeals and the order of the Supreme Court. Accordingly, on Friday, June 13, these Courts issued an "Order for Appearance and to Show Cause," ordering respondents to appear before a joint session of these Courts on Wednesday, June 18, and show cause why they should not be held in indirect criminal contempt.

*Contempt Hearing of June 18, 1980.*

Prior to the hearing, numerous motions to dismiss were filed by all respondents, all of which were taken under advisement. Three witnesses testified: Jeanene McCormack, Michelle's mother; R. Stephen LaPlante, attorney for the mother; and respondent Judge William D. Richardson. Respondent Richardson testified that, while he named the panel of judges in the Child in Need of Services (CHINS) case, he did not know how respondent Arthur was ultimately selected as special judge. Richardson did acknowledge, however, that he signed the special judge qualification sheet. Additionally, Judge Richardson testified that, when a petition alleging a child in need of services (CHINS petition) is filed in his court, he follows the statutory procedure.[5] Nevertheless, he could not explain why, at a minimum, he did not first examine the CHINS petition to determine if probable cause existed to believe Michelle Lemond was in need of services, and then authorize the filing of the petition by the prosecutor, had probable cause been found.

In this case, the prosecutor, respondent McGaughey, merely filed his petition alleging that Michelle was in need of services, without requesting permission to file the petition, and without obtaining authorization from respondent Richardson.

Finally, respondent Richardson's testimony revealed that he delayed the execution on the writ of habeas corpus in order to allow the respondents, McGaughey, Gray and Lemond, time to move forward with the CHINS proceeding. Attorney David B. Hughes[6] conducted questioning with regard to the enforcement of the writ of habeas corpus:

"Q. In other words, you granted the writ of habeas corpus but then decided it shouldn't be executed until 1:00 p. m. because you knew the other proceeding had been commenced and you wanted an opportunity for it to get off the ground, correct?

A. No. In other words, I wanted to give them an opportunity, if they could get a judge from another county, surrounding county to issue, it was all right with me. But I was out of it. I didn't intend to have anything to do with 80 J 20."

Contempt Proceeding Transcript at 84–85. Under questioning by Chief Justice Givan, this matter was pursued further:

"Q. You are stating to this Court, Judge Richardson, that you did that deliberately to allow this welfare matter to get off the ground?

A. No, no.

Q. I thought that is what you said.

A. If they could, I didn't figure I could act on this thing, on this welfare thing. It was none of mine, in-

---

4. The transcripts subsequently revealed that respondents Arthur and McGaughey repeatedly referred to the June 11 session as a "detention hearing."

5. The appropriate statutory procedure in a CHINS case is found in Ind. Code § 31–6–4–1 *et seq.* (Burns 1979 Supp.). Respondents' total failure to follow this procedure is discussed *infra.*

6. At the conclusion of the June 18, 1980, hearing before these Courts, Mr. Hughes was appointed as special prosecutor to continue the prosecution of the contempt citations against respondents Arthur, Gray, McGaughey and Lemond.

volved in this one here, and I figured I had to do what the Court of Appeals told me to do, and I did, and I delayed order of the Sheriff at 1:00 p. m. to take custody. In other words, their entry came out in two parts, as I recall their entry. One of them was that Mr. Lemond, Earl Lemond, was to place custody with the–and if not then the Sheriff was to assist him, to assist Mrs. McCormack in obtaining custody.

Q. But you delayed it until 1:00 because you knew this other matter was pending, did you say that?

A. Yes, sir."

Contempt Proceeding Transcript at 86.

The testimony of the mother essentially reiterated many of the facts as previously set out. Respondent McGaughey had the following exchange with the mother:

"Q. Where at the initiation of this proceeding and right prior to it, what did I do to cause, that you are saying, that I concertedly, intentionally, and willfully delayed you? How did I conspire with these people to do that?

A. Because you were involved in the action which was taken by counsel of Earl Lemond and the State or the County that you said you represented the State, as the County Prosecutor, in bringing an action that had no basis. The petition that my daughter is mentally disturbed or in some way unable to, I believe it was, physically or mentally carry on if she were to come with me and live with me, her mother. You were involved along with all of the other judges and attorneys in that action, Mr. McGaughey."

Contempt Proceeding Transcript at 86. Respondent McGaughey did not move to strike the answer.

During the course of direct examination of R. Stephen LaPlante, trial counsel for the mother, respondent Gray's role in this case was disclosed:

"Q. [By Mr. Hughes] I would like to call your attention to Thursday, June 5, 1980, in the afternoon hours of that day, and ask whether or not you had a conversation with attorney Thomas Gray who is in the court today?

A. I did.

Q. Where were you?

A. I was in my office.

Q. Where is that?

A. In Evansville, Indiana, the old National Bank Building.

Q. Did you call Mr. Gray or did he call you?

A. I don't recall. We had tried to communicate with each other several times that day on another case, and whether I was returning his call or he was returning mine, I can't recall that.

Q. Do you know Mr. Gray when you speak with him on the phone, I take it?

A. Yes, sir.

Q. On that date did you have a conversation with him about the Lemond–McCormack matter?

A. I did.

Q. At approximately what hour, Steve?

A. It was subsequent to 3:30 in the afternoon.

Q. Would you tell the Courts please what you said to Mr. Gray and what he said to you?

A. I asked Mr. Gray what was going to happen in Pike County the following day and he told me that he would be present with his client, Earl Lemond, standing tall and waiting for the Judge's orders.

Q. Standing tall?

A. Yes, sir.

Q. Those were his words?

A. Yes, sir.

Q. Waiting for the Judge's order?

A. Yes, sir.

Q. What else was in that conversation, if anything?

A. I told him that I had heard that there had been some kind of contact with the Department of Public Welfare in Pike County and I asked him what that was about, and he indicated to me that he did not know and that ...

Q. When you say he indicated to you that he did not know, do you recall what he said?

A. My recollection is that he said that he did not know what that was about, that he heard that the child in this particular case had sought separate counsel and he heard of communication with the Department of Public Welfare. That is my recollection.

Q. Was there any other conversation with him at that time?

A. He indicated to me at the close of our conversation that he did not represent the child and that his client was Earl Lemond, and that he wanted me to understand that, and he was going to be prepared to obey the Court's order, whatever that might be."

7. The full text of the Courts' Joint Order of June 18, 1980, reads as follows:

"On Friday, June 13, 1980, the Supreme Court of Indiana and the Court of Appeals of Indiana were presented with Informations alleging the possible contempt of each of said Courts. The Informations alleged that the Honorable James R. Arthur, Mr. Thomas C. Gray, Mr. Earl Lemond, and Mr. Jerry J. McGaughey might be in contempt of the decision of the Court of Appeals of Indiana, dated October 30, 1979, and also in contempt of the Order of the Supreme Court of Indiana Denying Transfer and Dissolving Stay, dated May 29, 1980. The individuals alleged of contempt were cited into these Courts for a hearing on Wednesday, June 18, 1980, at 1:30 p. m., wherein evidence was heard in part and the cause continued.

BEING DULY ADVISED IN THE PREMISES, the Supreme Court of Indiana and the Court of Appeals of Indiana hereby find that Special Judge James R. Arthur had no jurisdiction to entertain the Child in Need of Services proceeding filed on June 6, 1980, under Cause Number 80 J 20 in Pike Circuit Court and Special Judge Arthur in open court stated that all orders in said cause would be expunged by him immediately.

Contempt Hearing Transcript at 113–15. However, respondent Gray took the position at the CHINS hearings and before this Court that he no longer represented Earl Lemond and instead purported to act as Michelle's "independent" counsel.

During the course of the testimony in the contempt hearing, the respondents insisted that the transcripts from the CHINS proceeding would be the "best evidence," and objected to other testimony as to what occurred at the CHINS hearings. The transcripts were not available for the June 18, 1980, contempt hearing. However, these Courts did wish to give respondents the opportunity to produce them. Accordingly, these Courts indicated that the hearing would be continued and that the transcripts would be ordered produced for the resumption of the hearing. The Courts then unanimously ruled that respondent Arthur lacked jurisdiction in the case, and ordered that custody of Michelle Lemond be returned to her mother in the presence of the Courts.[7] Thereupon, Michelle Lemond was returned to Mrs. McCormack, and they were allowed to leave and return to Hawaii

IT IS ACCORDINGLY ORDERED that Michelle Lemond be turned over to the custody of Jeanene McCormack forthwith.

IT IS FURTHER ORDERED that Special Judge James R. Arthur is to expunge all entries under Cause Number 80 J 20 in the Pike Circuit Court. Additionally, Jeanene McCormack and Michelle Lemond are free to return to Hawaii at their pleasure.

The matter of the contempt hearing commenced on Wednesday, June 18, 1980, is hereby continued until Monday, June 23, 1980, at 9:00 a. m. The parties are to supply these Courts with copies of any and all transcripts from Cause Number 80 J 20 and Cause Number 78 C 71 which are pertinent to the hearing before these courts.

Additionally, Mr. David B. Hughes is hereby appointed by the Supreme Court of Indiana and the Court of Appeals of Indiana to continue with the prosecution of the alleged contempt of the Orders of the Supreme Court of Indiana and the Court of Appeals of Indiana. Attorneys fees for the continued prosecution are to be paid by the Supreme Court of Indiana.

SO ORDERED."

at their pleasure. The contempt hearing was then continued, with August 25, 1980 ultimately selected as the date for resuming the proceedings.

*Guilty Pleas.*

On August 15, 1980, respondents Arthur, Gray, McGaughey and Lemond each filed a "Verified Response to the Informations and Rules to Show Cause." These pleadings, in sum, indicated that each respondent:

(1) acknowledged that his actions frustrated the lawful transfer of custody of Michelle to her mother;

(2) chose not to contest the charges any further;

(3) prayed for the mercy of these Courts in imposing sentence; and

(4) continued to aver that his actions had been taken in good faith.

Thereafter, on August 25, 1980, these Courts found that Special Judge Arthur, attorney Thomas Gray and Pike County prosecutor Jerry McGaughey had willfully and intentionally violated the mandate of the Court of Appeals and the order of the Supreme Court. Notwithstanding respon-

dents' assertions to the contrary, these Courts found that their actions clearly were not taken in good faith. After considering all of the pleadings, the testimony before these Courts, and the transcripts from the CHINS hearings,[8] such a finding was inescapable. Accordingly, respondents Arthur, Gray and McGaughey were found guilty of indirect criminal contempt of both these Courts and fined in the sum of five hundred dollars. Respondent Earl Lemond was found not guilty of willfully violating the orders of these Courts; however, such a finding should *not* be interpreted as approving of or condoning Earl Lemond's conduct in this case.[9]

On August 26, 1980, these Courts cited before them William D. Richardson, regular judge of the Pike Circuit Court, to show cause why he should not be held in indirect criminal contempt of these Courts for having willfully and intentionally violated the orders of these Courts. Judge Richardson also chose not to contest this charge, and, upon consideration of the information, the testimony presented to these Courts, and the transcripts from the CHINS proceed-

---

**8.** The evidence revealed in the transcripts from the CHINS hearings will be considered *infra*.

**9.** The full text of these Courts' findings and order is as follows:

"Heretofore these Courts have issued their citations to Thomas C. Gray, Jerry J. McGaughey, the Honorable James R. Arthur and Earl Lemond to appear before these Courts and show cause why they should not be cited for contempt for failing to carry out the orders of the Court of Appeals and the Supreme Court in this case. On June 18, 1980, a hearing was commenced on the contempt citations. At the close of that day, a continuance was requested in order to obtain certain transcripts for submission to the Courts before continuation of the evidence. Each of the parties have now filed responses to the information and rule to show cause admitting the facts of the case, their culpability therein, and have asked the mercy of these Courts in levying sanction. Based upon the evidence heard, the transcripts received and the responsive pleadings now filed by each of the parties, the Supreme Court and the Court of Appeals do now jointly find:

That the respondents Thomas C. Gray, Jerry J. McGaughey and the Honorable James R. Arthur, are each guilty of contempt of the Supreme Court of Indiana and the Court of

Appeals of Indiana, in that they did each willfully conduct themselves in such a manner as to violate the mandate of the opinion of the Court of Appeals and the order of the Supreme Court in this cause. Therefore, the respondents Thomas C. Gray, Jerry J. McGaughey and the Honorable James R. Arthur are each fined in the sum of five hundred dollars ($500.00).

The Courts further find that there is no evidence in this record before the Courts that the respondent Earl Lemond intentionally did any act which can be construed as deliberate contempt of either the Supreme Court of Indiana or the Court of Appeals of Indiana. The evidence indicates that Earl Lemond is the father of a minor child involved in this litigation and that his actions were solely those of a parent caught up in an emotional situation and following the advice of his attorney. We, therefore, find that Earl Lemond is not guilty of contempt of either the Supreme Court or the Court of Appeals of Indiana.

A formal written opinion will be handed down in this case more specifically setting out the details of this case and giving a detailed explanation of the Courts' reasoning in finding the respondents guilty of contempt."

ings, Richardson was found to have willfully and intentionally violated the Courts' orders. Likewise, Judge Richardson was found in contempt of these Courts. His conduct was also found to have been in bad faith. Respondent Richardson received the same sentence imposed on respondents Arthur, Gray and McGaughey.

*Transcripts of CHINS Hearings.*

While a guilty plea normally terminates a case, we believe it important to elaborate on the evidence disclosed by the transcripts from the CHINS hearings conducted before respondent Arthur. As previously stated, these Courts, after considering the information, the testimony before these Courts on June 18, and, finally, the CHINS hearing transcripts, became convinced that this was not a good faith effort to help a child in need of services. Rather, it was a well orchestrated effort to thwart the orders of these Courts by prostituting the emergency authority of a juvenile court.

At the first hearing, in response to the CHINS petitions, Val Fleig, attorney for the mother, raised several valid questions as to their sufficiency and to the legitimacy of the proceedings.[10] Fleig made the following argument to respondent Arthur:

"Your Honor, as Mr. Gray has advised the Court, this Court pursuant to the Order of the Indiana Supreme Court entered an order this morning granting the Writ of Habeas Corpus directing Mr. Lemond and the Sheriff of Pike County, Indiana to assist Mrs. McCormack in securing the custody of her child. The speed with which these petitions have been filed have caught us somewhat by surprise. But in all frankness, Mrs. McCormack has not had this child in her custody and she has not seen the child for two years because of this prior litigation. We walk in here today and we are faced once again with an attempt to stop her from having her custody, having her child. As far as the petitions that have been filed, those petitions are not filed, even according to law, they have never

either the Welfare Department acting through Mr. McGaughey or Michelle, acting through her attorneys have ever requested this Court for authority to even file a petition. They simply walk into the Court, stamp it filed and that is it. And, under § 31–6–4–3, it requires this Court— the Court has to determine then whether or not it should even be filed. The authority that they cite for the physical examination, I think, what we are getting at, which is set in Dorothy Wiseman's affidavit. Under that section, it is my understanding that it first has to be a petition to authorize before the Court can even grab the child. In their petition, they are asking the very same Court that was ordered by the Supreme Court to deliver the child to enjoin her to having her child again. We haven't even had the opportunity to see the child today, to see what the reaction is. We are faced with affidavits. The amended petition alleges that the child is a child in need of services in that her physical and mental condition is seriously impaired and endangered as a result of the change of custody. Where they cite § 31–6–4–3, and I assume that they are talking about subsection two, it says physical and mental health is seriously endangered due to injury by the act or omission of his parent, guardian or custodian. They don't allege that part of it in this petition. If there is harm done, I assume they are alleging the Supreme Court of Indiana did it, because they are the ones that ordered the return. The counsel for Michelle Lemond has also filed a petition alleging [a] child in need of services, yet there is no authority under the Juvenile Code for the child or the child's attorney to file such a petition. It is done after the Welfare Department has done an investigation and has found cause, has submitted to the attorney and that attorney makes a decision on whether or not it should be filed and he requests the Court to file it, if the Court okays it, then it is filed. Michelle's peti-

---

10. We commend Mrs. McCormack's attorneys, R. Stephen LaPlante and Val Fleig, for their patience and perseverance in dealing with Judge Arthur.

tion is not authorized anywhere. Your Honor, we almost beg the Court not to let this thing continue on and on and on. The requested order that they have prepared sets no deadline, it sets nothing. Mrs. McCormack came here from Hawaii this morning hoping that for the first time, she would receive her child. Again we are in Court under a new theory, they have lost on the first one and we are faced with another. Your Honor, we implore the Court not to permit a second chance to circumvent the Supreme Court of Indiana. That is all we are asking. Thank you."

Transcript of June 6, 1980 CHINS Hearing at 3–5.

This concise and correct statement of the law and the many apparent defects in the CHINS proceeding were totally ignored by respondent Arthur, who, with only the conclusory statements of the CHINS peti-

tions,[11] and upon *no* evidence, found Michelle to be in need of services. The petitions simply alleged that Michelle did not want to go back to Hawaii because she was afraid of her mother. In respondent Lemond's petition, there was an allegation that Michelle might run away.[12] No specific facts were asserted by anyone as to the alleged mental problem of Michelle. She was not present at either the habeas corpus hearing or the CHINS hearing on June 6, 1980. The evidence has since disclosed that Michelle was placed in the custody of the Pike County Welfare Department and ordered to undergo mental evaluation in Vincennes.

On June 11, 1980, the trial court ordered a second hearing, wherein R. Stephen LaPlante again attempted to point out that the case had been concluded and that Special Judge Arthur was without jurisdiction:[13]

---

11. The transcripts disclose that not one, but four CHINS petitions were filed. Respondents McGaughey and Lemond each filed one, the school nurse filed one, and Michelle Lemond, by her purported counsel, respondent Gray, filed one. It is also interesting to note how the nurse's petition was initiated. The nurse testified at the CHINS hearing that Michelle's father, Earl Lemond, had come to her on June 4, 1980, asked her to examine Michelle. Prior to that time the nurse had had little contact with Michelle. This contact had occurred only when Michelle occasionally came to her at school to borrow lunch money. The nurse filed her CHINS petition on June 6, alleging that Michelle was in need of services; yet, five days later, she testified that Michelle seemed to her to be a well–adjusted young lady. Transcript of June 11, 1980 CHINS Hearing at 25, 28–29, 32. Moreover, irrespective of the apparent lack of substance in the various petitions, which will be detailed *infra*, the statute permits only the prosecutor or county attorney to file a CHINS petition. Ind. Code § 31–6–1–10 (Burns 1979 Supp.).

12. Respondent Lemond's CHINS petition typifies the four which were filed in this case, and reads as follows:

"Earl Lemond, being first duly sworn upon his oath, deposes and says:

1. That he is the father of Michelle Lemond, who presently resides with him at Velpen, Indiana and that there is presently pending in the Pike Circuit Court, a Habeas Corpus proceeding wherein his daughter, Michelle Lemond, will soon be ordered by the Court to return to her mother, Jeanene McCormack. Michelle Lemond is 12 years of age, having been [born on] May 1, 1968 and Michelle Lemond has had a number of emotional outbursts and has stated that she will not go back to her mother. From things told this Affiant by Michelle Lemond, this Affiant believes Michelle Lemond has a deep seated fear and resentment of her mother and that returning to her mother creates severe mental anguish which may be presently resulting in a mental condition and which might result in a permanent psychiatric condition. This Affiant further believes that the mother of said child is not mentally capable of caring for said child and cannot provide said child with a suitable environment, inasmuch as said mother is in the process of obtaining a divorce to dissolve her third marriage. This Affiant further believes that there is a high likely hood (sic) that Michelle Lemond will leave the jurisdiction i. e. run away before said proceedings.

WHEREFORE, Affiant states that he believes that an emergency exists and that he prays for a temporary injunction from the juvenile court for the purposes of providing said child with a mental examination pursuant to I.C. 31–6–7–12 and to further prevent the child from leaving the jurisdiction, all as set forth in I.C. 31–6–7–14."

Transcript of June 6, 1980 CHINS Hearing at 11–12.

13. Motions to dismiss and objections to the proceedings were presented at both the June 6 hearing and the June 11 hearing.

"Mr. LaPlante: Does the Court wish to see the Appellate Court's decision, Your Honor?

The Court: No sir, I would not. Would you like for me to tell you why?

Mr. LaPlante: Certainly.

The Court: [The] Appellate Court decision has nothing to do with this case.

Mr. LaPlante: I would like to address that issue.

The Court: You certainly may.

Mr. LaPlante: Your Honor, while this case is new to you . . .

The Court: Yes, let us make that clear. This is a new case, it has nothing to do with the other case. This cause is new to me, it is filed in this Court under a new number, it is not any part of the other case. Now, you may proceed sir.

Mr. LaPlante: This [is a] continuation [of] litigation that has been in existence for an excess of two years. During which my client, Jeanene McCormack, has been denied her parental rights, despite having an order of the Court granting the custody of a minor child. That case was decided in the State of Hawaii. This case was decided in the Pike Circuit Court, and that case was decided in the Appellate Court of the State of Indiana. That case was decided in the Supreme Court of Indiana. It has been in this Court in excess of seven days on this matter. At the last hearing you sir, indicated to counsel that your interest was in the best interest of the child. I am always hesitant to respond to that because the presumption is—with that we are not, but that is not correct. What we are seeking to do, is that we are seeking to have our proper rights exercised, we are seeking to have this woman have the custody of her child. This Court is going to relitigate something that has already been litigated. We think that because of that, we are getting beyond what should be the issue in that case and that is what is the best interest of the child, which has already been litigated. Litigation must end some time. My client, it was represented that she come here from Hawaii to exercise her custodial rights, which have been granted by the Hawaii trial court, the Indiana Appellate Court and the Supreme Court of Indiana and now the Pike County Circuit Court. *She was advised to be here last June 6, 1980 by an attorney representing her ex–husband and on that date, that same attorney, now representing the child, met her with a petition to put the child in a foster home.* It seeks to restrain the order of the Pike Circuit Court, and ask that benefit of the State of Indiana to appear to make argument, to frustrate or continue exercise of her custodial rights. This Court has adjudicated that both of the parents are fit and proper persons to have custody of the child. They interpreted the court order, of Hawaii, they have litigated it. Litigation must end and we believe that the doctrine of res judicata and collateral estoppel apply. *We ask that the court recognize what counsel for the child is trying to do. We think it is a rather disguised attempt to frustrate the order of the Supreme Court of the State of Indiana. We would ask that this Court dismiss this petition and dissolve the restraining order against my client.*

The Court: *Wait just a minute. Where is there a restraining order against your client, sir?*

Mr. LaPlante: *It is my understanding that this Court restrained my client from removing the child from the jurisdiction of this Court.*

The Court: *No, you are badly mistaken. This Court granted temporary custody of this child, and placed the child with the Department of Public Welfare, I believe that there is a difference sir. If you had been to law school, you will recognize the difference.*

Mr. LaPlante: I have not seen that order, sir."

Transcript of June 11, 1980 CHINS Hearing at 3–6. If Special Judge Arthur had read the CHINS petition filed by respondent Gray, allegedly on behalf of Michelle Lemond, he would have seen that a restraining order *was* sought against Mrs. McCor-

mack.[14] This petition was filed on June 6. In fact, at the June 6 hearing, Arthur ruled directly contrary to this later assertion to LaPlante. After Arthur announced that he was ordering that Michelle be made a ward of the Welfare Department, respondent Gray, who purported to be representing Michelle, initiated the following exchange:

"Mr. Gray: Would the court like to draft its own order or inform me how to redraft it or whatever? There was a paragraph down there, I would also . . . Mr. Lemond in this case is not represented, but he may well agree to be restrained from moving the child from the jurisdiction of the court as well as from the Welfare Department.

The Court: Both parties are restrained from moving the child from the custody of the Welfare Department. I want no misunderstanding about that."

Transcript of June 6, 1980 CHINS Hearing at 9. Clearly, then, respondent Arthur's order of June 6, placing temporary custody with the Department of Public Welfare, had the full effect of a restraining order.

The above–quoted brow–beating was not the only instance where respondent Arthur addressed unwarranted and improper demeaning statements to Mr. LaPlante from the bench. During closing argument after the June 11 hearing, Mr. LaPlante contended the evidence did not support a finding that the child should be detained, and renewed his argument that Judge Arthur lacked jurisdiction and should release the child to her mother. Judge Arthur responded in this fashion:

"The Court: I am not interested in speculating, you are the one that is doing the speculating, sir. Not me. It is my decision to make, not yours.

Mr. LaPlante: I understand that.

The Court: Well, you stood up and said that the Court had no right to make a decision here today. Now, I have got every right to, and I intend to. You understand me, sir?

Mr. LaPlante: That is right.

The Court: Good. I once had an attorney stand up in court and starting laughing at what the other side was saying and I ask him what he saw was funny and he said it was a funny argument that man was making and I said I didn't see anything funny about it, I agreed with it. You have no right to ever stand up in this Court, sir, and tell me this Court has no right to make a decision based on what evidence it has heard. This Court or any other Court, sir. You may make a statement if you want that you think that the facts indicate that a decision ought to be reached, but don't ever stand up in my Court again, sir, and tell me I have no right to make a decision of such and such.

Mr. LaPlante: With all due respect, sir, you are misconstruing my final . . .

The Court: I am not misconstruing you, I can understand [the] English language, sir, I heard it and it is on the record. If you want me I will have the court reporter play it back."

Transcript of June 11, 1980 CHINS Hearing at 80–81. Of course, Mr. LaPlante was arguing that the evidence would allow only one reasonable decision–the decision to turn the child over to her mother, and thereby comply with the orders of these Courts. Based on the feeble record presented to Judge Arthur, Mr. LaPlante was absolutely correct.

Regarding respondent Thomas Gray, the record is replete with evidence of his bad faith. One example concerned Gray's communications with Mrs. McCormack and her attorneys. Gray called Mrs. McCormack on June 4 and represented to her that she could pick up Michelle on Friday, June 6, at 9:00 a.m. The next day, June 5, Gray made a series of misrepresentations to Mrs. McCormack's counsel, LaPlante. Gray told LaPlante that Earl Lemond was his client, and that they would be "standing tall" awaiting the orders of the court on June 6. Further, Gray informed LaPlante that Michelle Lemond was seeking independent counsel. It developed, of course, that *Gray* appeared in court on June 6 purporting to

14. *See also* note 12; *supra.*

be Michelle's "independent" counsel and disavowing any attorney–client relationship with Earl Lemond. Miraculously, Earl Lemond, proceeding *pro se*, had fashioned a CHINS petition which, in form, would have been a credit to any attorney. Finally, respondent Gray completely confirmed the culpability of his conduct on June 11 at the second CHINS hearing, when he responded to Mr. LaPlante's argument as follows:

"Your Honor, I do not intend to, do not want to make any comment whatsoever about the allegations that Mr. LaPlante made in the other case, just simply state that if we are called on the carpet on that, I am ready, willing and able to go anywhere, anytime and answer for my conduct and I thank this Court for simply looking into and seeing whether or not we have a child that needs help or not. If the child doesn't need help it doesn't need help. If the child does, I am confident that this Court will take the appropriate steps. Thank you."

Transcript of June 11, 1980 CHINS Hearing at 17.

As the contempt proceedings began in these Courts, respondents repeatedly claimed that Special Judge Arthur had jurisdiction because, at the time the petitions were filed, there was a danger that Michelle would run away. Upon reviewing the transcript from the CHINS hearings, it became clear to these Courts that this allegation was nothing more than a pretense for Judge Arthur's assuming jurisdiction. Respondent Earl Lemond testified that Michelle never said she was going to run away. At one point in his testimony, Earl Lemond stated that Michelle "sort of wandered off" prior to the scheduled transfer of custody at 9:00 a.m. on June 6, which was also the date of the first CHINS hearing. As a matter of fact, Michelle was never lost. This conclusion is clearly shown by the fact that Michelle signed a petition that day prior to the CHINS hearing in Gray's office, alleging herself to be in need of services. Obviously, only Mrs. McCormack and her attorneys had any difficulty in locating Michelle. The girl also testified at the second hearing that she never told her father she was going to run away.

Each of the four CHINS petitions also alleged that Michelle was afraid of her mother. However, when Michelle testified at the second hearing, the following exchange occurred.

"Q. When you saw your mother, were you afraid of her?

A. I don't know, I guess.

Q. You guess?

A. A little.

Q. A little?

A. Yes.

Q. What were you afraid of?

A. Just her.

Q. Earl?

A. Her.

Q. Were you afraid of her because she had asked for custody of you?

A. What do you mean?

Q. Do you understand that you parents have each been asking the Court for you to live with them?

A. Yes.

Q. Is that why you were afraid of your mother?

A. No.

Q. Why were you afraid of your mother?

A. Because she would go on trips and she would leave me with a babysitter and she would send Sherry out to a boarding school far away. I don't know why, she would just do it."

Transcript of June 11, 1980 CHINS Hearing at 68. This was the only specific testimony concerning the "cause" of Michelle's alleged fears and mental problem.

Also included in the transcript of the June 11 CHINS hearing was testimony given by Sheila Tisdale, Michelle's half–sister, regarding the short visitation permitted between Mrs. McCormack and Michelle after two years' separation:

"Q. When was the last time that you saw Michelle?

A. I guess it was Friday.

Q. Where at?

A. At that lady's house, I don't know.

Q. Mrs. Tincher's?

A. Yeah, I guess that is her name.

Q. Were you present when Michelle and her mother were visiting each other?

A. Yes, I was.

Q. Did you hear your mother ask Michelle whether or not Michelle loved her?

A. Yes, I did.

Q. What did she say?

A. She said, 'Yes.'

Q. Did they embrace?

A. Yes.

Q. Did they hug?

A. Yes.

Q. What did you observe? Was Michelle hesitant to hug her?

A. No.

Q. Was it freely given as far as you could tell?

A. Yes.

Q. Did Michelle seem scared to death?

A. Not really, she, you know, I don't think she seemed scared, she was just you know, I don't know.

Q. A little upset?

A. Yeah."

Transcript of June 11, 1980 CHINS Hearing at 74. The Tinchers were persons chosen by the Pike County Welfare Department who apparently cared for children who might be in need of services.

Purely as a matter of equity and common sense, it is inconceivable how respondent Arthur could have ordered further detention of Michelle after the June 11 hearing. The CHINS petitions were vague and conclusory. The record is replete with inconsistencies, and without question demonstrates respondents' bad faith. The record is likewise totally devoid of credible evidence to support respondent Arthur's orders.

Respondents argue that, when Judge Richardson granted the writ of habe-

as corpus, these Courts' orders were thereby fully complied with. A similar position was advanced in *State ex rel. Purcell v. Sullivan Circuit Court*, (1950) 228 Ind. 410, 92 N.E.2d 843. In that case, a circuit court judge entered an order which seemingly complied with a writ of prohibition issued by the Supreme Court. The facts behind the trial court's order, however, demonstrated that the order was merely a sham, designed to avoid the force and effect of the writ. In finding the circuit court judge in contempt, the Supreme Court cautioned that "[t]his Court . . . is not blind," and proceeded to look past the trial court's order to his actual behavior. *Id.* at 425, 92 N.E.2d at 849. Similarly, these Courts are not blind to the true nature and purpose of these respondents' conduct.

*Special Judge Selection Procedure.*

Before proceeding to the jurisdictional question in this case, we shall speak briefly to the striking procedure used to select respondent Arthur as special judge in Cause Number 80 J 20, the CHINS case. Without question, neither Mrs. McCormack nor her attorneys were informed that a panel had been named or that any striking had occurred or would occur. The Pike Circuit Court's entry for this striking reads as follows:

"Petition filed alleging child in need of services and the Court examines said petition and now disqualifies himself herein.

The Court now names a panel of Honorable James R. Arthur, Judge of the Daviess Circuit Court; Honorable Walter Palmer, Judge of the Gibson Circuit Court and Honorable Donald Hendrickson, Judge of the Warrick Circuit Court from which the parties are to strike as provided by law.

Comes now the parties by their respective attorneys and strike the Honorable James R. Arthur, Judge of the Daviess Circuit Court remains unstricken who is appointed Special Judge herein.

Comes now Honorable James R. Arthur, Judge of the Daviess Circuit Court

takes the oath, qualifies and assumes jurisdiction herein."

Transcript of June 6, 1980 CHINS Hearing at 2. This entry is, at best, a prime example of appalling record keeping, but, more likely, is further evidence of respondents' bad faith. As noted above, respondent McGaughey's affidavit to these Courts states that he and the Pike Circuit Court Clerk accomplished the striking.

■ Ind. Code § 31–6–7–1 (Burns 1979 Supp.) specifically states that the Indiana Rules of Trial Procedure shall apply to procedural matters not covered by the Juvenile Code. Thus, the striking here could have been accomplished under Trial Rule 79(4). That rule provides:

"(4) If neither method provided for by subdivisions (2) or (3) for the selection of a special judge be adopted, then the presiding judge, or if there be no such judge, the regular judge of the court, shall submit a list of three (3) persons from which, by striking, an appointee may be selected. In an adversary proceeding each party may strike one (1) name and in an ex parte proceeding said party shall be entitled to strike one (1) name from such list. The moving party shall strike first. From the name or names remaining the judge submitting such list shall select and appoint the special judge.

In cases other than those enumerated in subdivision (1) where a judge on his own motion disqualifies himself, the plaintiff side shall strike first. If the special judge selected hereunder qualifies then subsequently becomes disqualified by reason other then the filing of a motion for change from the judge, or disqualifies himself, such fact shall be certified to the Supreme Court which thereupon shall appoint a special judge."

The very nature of a CHINS proceeding would usually presuppose a situation where the operation of Trial Rule 79(4) would not be necessary; that is, the typical CHINS case might only infrequently involve an "adversary proceeding." However, in those few instances where an adversary relationship is present and such a procedure is necessary, we specifically hold that the custodial parent–in this case, Mrs. McCormack–is a party for the purpose of striking. Thus, in a case such as this, in terms of the adversary relationship contemplated by Trial Rule 79(4), for purposes of striking to obtain a special judge, the custodial parent, if available, stands in the shoes of the defendant, while the prosecutor or county attorney stands in the shoes of the plaintiff. As explained above, in this case, neither Mrs. McCormack nor her counsel participated in the striking, and the court's entry states only that "the parties" struck the names.

On the other hand, however, at the June 6 CHINS hearing, the record discloses that respondents then treated the mother as a party. Indeed, when the hearing opened, respondent Arthur asked respondent Gray if he wished to be heard on his CHINS petition. Gray did, in fact, make an opening statement. Thereafter, the mother's counsel spoke. Only then did respondent McGaughey ask to be heard in addition to "the parties." Further, as noted above, when the June 6 hearing was concluded, Arthur ruled that "both parties" were restrained from removing Michelle. Transcript of June 6, 1980 CHINS Hearing at 2–5, 9.

## JURISDICTION

Respondents initially presented a plethora of arguments which amounted to nothing more than attempts to raise a smoke screen and avoid the consequences of their deplorable conduct. The sole legal issue in this case is whether the juvenile court's jurisdiction was properly invoked. The Court of Appeals decision in this case held that, under the Uniform Child Custody Jurisdiction Act (UCCJA), Indiana was not the child's home state and thus not the proper state to determine further custody matters. *In re Lemond*, (1979) Ind.App., 395 N.E.2d 1287, 1291. As stated earlier, the law of the case was established in that decision and if there had been a change in circumstances warranting a change in the divorce decree, this was for a Hawaii court to decide.

This is not to say that an Indiana court under proper circumstances could never exercise emergency jurisdiction under the UCCJA. The emergency provision of that act, Ind. Code § 31–1–11.6–3 (Burns 1979 Supp.), provides in pertinent part:

"(a) a court of this state which is competent to decide child custody matter has jurisdiction to make a child custody determination by initial or modification decree if:

.    .    .    .    .

(3) The child is physically present in this State and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent."

The Supreme Court of Indiana recently addressed the narrow nature of the emergency powers under subsection (a)(3) of the UCCJA in *State ex rel. Marcrum v. Marion Superior Court*, (1980) Ind., 403 N.E.2d 806. The Court in *Marcrum* stated:

"The only jurisdictional prerequisite under this subsection is presence of the child in this state. However,

'When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph.' National Conference of Commissioners on Uniform State Laws, Note to U.C.C.J.A. § 3 (1968), 9 U.L.A. 123, 124 (1979). We have no evidence before us indicating abandonment or an emergency, and we note that the father's self–serving statements alone are not sufficient to confer jurisdiction under this provision. *Young v. District Court*, (1977) 194 Colo. 140, 570 P.2d 249."

*Id.* 403 N.E.2d at 808.

■ These Courts will not tolerate the attempted use of emergency jurisdiction to reopen a fully litigated and decided custody battle, which is precisely what occurred

here. Only where there is substantial evidence, not simply conclusory assertions, of an emergency, can emergency jurisdiction under § 31–1–11.6–3(a)(3) be invoked. In the case before us, the evidence clearly demonstrates nothing more than conclusory CHINS petitions initiated at the behest of the father, respondent Lemond, and his attorney, respondent Gray. In fact, the hearings on these CHINS petitions demonstrated a total lack of evidence to support respondent Arthur's findings and conclusions.

■ One express purpose of the UCCJA is to avoid the continued controversies and abductions, and the repeated relitigation of custody matters. Additionally, it is the intent of the legislature that proper custody decrees from other jurisdictions be enforced. Ind. Code § 31–1–11.6–1 (Burns 1979 Supp.); *State ex rel. Marcrum v. Marion Superior Court, supra*. For these reasons, trial court judges must in all cases take a close look to determine if they should invoke emergency jurisdiction under the UCCJA. Here, however, respondents did not even purport to act under the emergency jurisdiction section of the UCCJA; instead they allegedly acted under the Child in Need of Services Statutes, Ind. Code § 31–6–4–3 *et seq.* (Burns 1979 Supp.), and the Emergency Medical Treatment sections of the Juvenile Code, Ind. Code §§ 31–6–7–12–14. In any event, to have attempted to act under the emergency sections of the UCCJA under the facts of this case would have been clear error.

■ Respondents next contend that jurisdiction existed and was properly invoked under the CHINS statutes. Of course, in a true emergency situation, a juvenile court does have subject matter jurisdiction under the CHINS statutes. However, that jurisdiction must be invoked properly, and a court does not acquire jurisdiction over a particular juvenile case where the jurisdictional prerequisites are completely ignored.[15] Clearly, Ind. Code

---

15. These Courts permitted the Indiana Prosecuting Attorneys Association to file a brief *amicus curiae*. *Amicus* candidly admits that respondents may have failed to meet the jurisdictional prerequisites for invoking emergency juvenile court jurisdiction. The major concern

§ 31–6–2–1 (Burns 1979 Supp.) gives a juvenile court exclusive original jurisdiction over CHINS cases. However,

> "the exclusive original jurisdiction may only be obtained by the juvenile court as set forth above and unless such preliminary statutory procedural steps are taken there is no jurisdiction established."

*Summers v. State,* (1967) 248 Ind. 551, 557, 230 N.E.2d 320, 323.[16]

An examination of the CHINS statutes shows the following statutory prerequisites to jurisdiction. First, Ind. Code § 31–6–4–3(a)(1), (6) (Burns 1979 Supp.) provide the definitions of "child in need of services" under which respondents ostensibly proceeded:

> "(a) A child is a child in need of services if before his eighteenth birthday:
>
> (1) his physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of his parent, guardian or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision;
>
> .    .    .    .    .
>
> or
>
> (6) he substantially endangers his own health or the health of another; and needs care, treatment, or rehabilitation that he is not receiving, that he is unlikely to accept voluntarily, and that is unlikely to be provided or accepted without the coercive intervention of the court."

*Cf.* Ind. Code § 31–6–4–3 (Burns 1980 Supp.) (effective October 1, 1980). It is highly questionable whether Michelle Lemond fitted within either of these definitions. There was no substantial evidence that either parent failed to discharge his or her duties,[17] or that Michelle had substantially endangered her own health or that of another.

Ind. Code § 31–6–4–8 (Burns 1979 Supp.) establishes the next steps to be followed in

---

*amicus* raises, however, is that our decision here will preclude an Indiana juvenile court from acquiring jurisdiction where there is an out-of-state decree. Of course, this is *not* the end result of this case, and our discussion of this issue should alleviate this concern.

*Amicus* also asserts that there may be a conflict between the emergency provision of the U.C.C.J.A. Ind. Code § 31–1–11.6–3(a)(3), and the juvenile court's exclusive original jurisdiction to handle emergencies under Ind. Code § 31–6–2–1. We think, however, that these two statutes can be given full effect without a conflict arising. Where two statutes deal with the same subject matter, they should be read together and construed so as to harmonize and give effect to each. *E. g., Schrenker v. Clifford,* (1979) Ind. 387 N.E.2d 59. We agree with the following assertion found in the brief of *amicus curiae:*

> "The provisions from both laws can be construed in pari materia to effectuate the similar policies of both if the juvenile court assumes temporary jurisdiction only for the duration of the emergency and terminates its jurisdiction after the emergency has passed. The jurisdiction in the juvenile court should be invoked only in a true emergency and should be exercised upon the receipt of sound evidence as to the nature of the emergency by the juvenile court order."
>
> Brief of *Amicus Curiae* at 5.

16. At the time *Summers v. State* was decided, the grant of exclusive jurisdiction in neglect and dependency cases (the functional equivalent of the current "child in need of services" cases) and delinquency cases was found in Ind. Code § 33–12–2–3 (Burns 1966 Supp.). At that time, the prerequisites to jurisdiction were found in Ind. Code § 31–5–7–8 (Burns 1972 Supp.).

17. In fact, Earl Lemond was the only parent who was even in a position to have failed to perform his duties, because he alone had had *de facto* custody of Michelle for the preceding two years. Under the Pike Circuit Court's method of handling this case, Mrs. McCormack was not to obtain custody until 1:00 p.m., approximately four hours after the CHINS petitions were filed. Thus, even if Michelle had been neglected (under this statute) previously, it was Earl Lemond who had neglected her, not Mrs. McCormack. Logically, then, even if Michelle had been neglected, the best solution would have been to have relieved Earl Lemond of custody rather than Mrs. McCormack. In fact, since Mrs. McCormack had not had custody of Michelle in two years, there would have been no evidence from which respondent Arthur could have found, as required under the definition quoted above, that it would have been likely that Michelle would not have received the proper "care, treatment or rehabilitation" from her mother, who was to get custody under the writ of habeas corpus order.

acquiring or establishing jurisdiction in a CHINS proceeding. That section provides:

"(a) Any person may give an intake officer written information indicating that a child is in need of services. If the intake officer has reason to believe that the child is a child in need of services, he shall make a preliminary inquiry to determine whether the interests of the child require further action.

(b) A preliminary inquiry is an informal investigation into the facts and circumstances reported to the court. Whenever practicable, it should include information on the child's background, current status, and school performance.

(c) The intake officer shall send to the prosecutor or the attorney for the county department a copy of the preliminary inquiry. He shall recommend whether to file a petition, informally adjust the case, refer the child to another agency, or dismiss the case.

(d) The person representing the interests of the state and receiving the preliminary inquiry and recommendations shall decide whether to request authorization to file a petition. This is final only as to the office of the person making it."

*Cf.* Ind. Code § 31–6–4–8 (Burns 1980 Supp.) (effective October 1, 1980).

■ If the prosecutor or county attorney determines that a petition should be filed, he must obtain authorization for such filing from the juvenile court. This procedure is clearly spelled out in § 31–6–4–10:

"(a) The prosecutor or the attorney for the county department may request the juvenile court to authorize the filing of a petition alleging that a child is a child in need of services; that person shall represent the interests of the state at this proceeding and at all subsequent proceedings on the petition.

(b) The juvenile court shall consider the preliminary inquiry and the evidence of probable cause. The court shall authorize the filing of a petition if it finds probable cause to believe that the child is a child in need of services.

(c) The petition shall be verified and be entitled 'In the Matter of _____, a Child Alleged to be a Child in Need of Services,' must be signed and filed by the person representing the interests of the state, and must contain the following information:

(1) A citation to the section of this article that gives the juvenile court jurisdiction in the proceeding.

(2) A citation to the section of this article that defines a child in need of services.

(3) A concise statement of the facts upon which the allegations are based, including the date and location at which the alleged facts occurred.

(4) The child's name, birth date, and residence address, if known.

(5) The name and residence address of the child's parent, guardian, or custodian, if known.

(6) The name and title of the person signing the petition."

The "concise statement" of facts called for in subsection (c)(3) contemplates a substantial recitation of specific facts which demonstrates that a child may be in need of services. Moreover, just as the UCCJA emergency jurisdiction subsection, § 31–1–11.6–3(a), requires substantial non–conclusory, non–self–serving facts to be alleged, so it is with § 31–6–4–10(c)(3). *See State ex rel. Marcrum v. Marion Superior Court, supra.*

■ However, in examining the facts of this case, we find virtually a total failure to abide by and follow these clear statutory procedures. Specifically, the evidence before these Courts reveals, first of all, that the Pike County Welfare Department was conspicuously missing from the entire procedure; no written preliminary inquiry was submitted by the Welfare Department to respondent McGaughey, the prosecutor. Second, McGaughey did not initially seek the necessary authorization to file the petition; further, neither respondent Richardson nor respondent Arthur even purported to make the necessary finding of probable cause. Third, while the statute permits

only the prosecutor or county attorney (persons representing the interests of the State) to sign–and seek the filing of–a CHINS petition, here, the school nurse, respondent Earl Lemond, and Michelle Lemond, by her attorney respondent Gray, each filed a CHINS petition. Fourth, these CHINS petitions, contrary to the statute's demand for a "concise statement of the facts on which the allegations are based," were merely conclusory in form and content.

Further, in light of these glaring defects and the apparent lack of substance of the allegations presented, it is relevant that respondent Arthur was, in fact, presented with several requests to examine the petitions and see the case as it really was–a sham proceeding. Val Fleig, Mrs. McCormack's counsel, called these defects to Arthur's attention and asked that the proceeding be dismissed. Respondent McGaughey evidently recognized these defects himself, for he subsequently argued that the State was also proceeding under the emergency treatment statutes, Ind. Code §§ 31–6–7–12, 31–6–7–14.[18] Respondent Arthur then interpreted the statements that had been made as a statutory request by McGaughey that he be allowed to file the petition. McGaughey made no specific request of this sort, and Arthur made no specific finding of probable cause, as required by § 31–6–4–10(b).

▇▇▇ After the prerequisites for filing are met, the CHINS statutes call for additional jurisdiction steps. The juvenile court is to hold an initial hearing and advise the parents of their rights and possible dispositional alternatives. Ind. Code § 31–6–4–13.5 (Burns 1979 Supp.). Thereafter, where the facts of the case are not admitted, a fact–finding hearing is to be held, at which evidence is to be taken. § 31–6–4–14. However, in the present case, it does not appear that respondent advised the parents of their rights and the dispositional alternatives. Additionally, respondent Arthur specifically found Michelle to be in need of services at the close of the first CHINS hearing on June 6, wherein no evidence was taken. Such a finding is clearly not contemplated until the fact–finding hearing is held pursuant to § 31–6–4–14.

▇▇▇ As noted earlier, respondents attempt, alternatively, to justify the juvenile court's jurisdiction upon the basis of the emergency treatment provisions of the juvenile code, Ind. Code §§ 31–6–7–12, 31–6–7–14. Section fourteen states in pertinent part:

"(a) Upon its own motion or upon the motion of the child, the child's parent, guardian, custodian, or guardian ad litem, a probation officer, caseworker, the prosecutor, the attorney for the county department, or any person providing services to the child or his parent, guardian, or custodian, the juvenile court may, for good cause shown upon the record issue an injunction:

(1) to control the conduct of any person in relation to the child;

(2) to provide a child with an examination or treatment under Ind. Code § 31–6–7–12; or

(3) to prevent a child from leaving the court's jurisdiction."

Further, section twelve provides:

"(a) If the procedures under Ind. Code § 31–6–7–14 are followed, the juvenile court may authorize mental or physical examinations or treatment under the following circumstances:

(1) Where the court has not authorized the filing of a petition, but where a physician certifies that an emergency exists, the court may order medical or physical examination or treatment of the child and may order the child detained in a health care facility while the emergency exists.

. . . ."

In the case before us, respondent McGaughey requested a protective order and mental examination pursuant to section twelve. As this section clearly establishes, such orders are proper only where a physician has certified that an emergency exists. The

18. We shall answer this contention infra.

record reveals that, prior to the filing of these petitions, no physician ever examined Michelle relative to this case, and no physician ever certified that an emergency existed which warranted an examination or detention. Nevertheless, respondent Arthur ordered these procedures. Again, for emergency jurisdiction to be invoked under these statutes, the facts presented must be substantial, non–conclusory, and non–self-serving. Thus, in addition to the overwhelming evidence showing respondents' bad faith, it is clear from the record that few, if any, jurisdictional prerequisites were met. Therefore, respondent Arthur actually had nothing before him, and the obviously sham CHINS proceedings should have been dismissed.

█ The brief by *amicus curiae* questions whether the result of this contempt proceeding will be an unwillingness in trial judges to act, even in emergency case, where there is a valid and enforceable foreign custody decree. Of course, when probative, substantial and specific evidence of a clear emergency is presented to a juvenile court, the court should not hesitate to exercise jurisdiction pursuant to the appropriate statutes. Additionally, such jurisdiction could be properly exercised where, as here, an appellate court has found that a foreign custody decree should be enforced.

█ On the other hand, the facts and circumstances of this case do not even remotely approach the point at which jurisdiction could be rightfully and legitimately exercised. In a case such as this, where: (1) after protracted and lengthy manoeuvering and litigation, these Courts each finally determine that a foreign custody decree should be honored; (2) an information is filed with these Courts wherein, by specific and substantial allegations, it appears that there has been a wilful and intentional effort to circumvent or thwart orders of these Courts; and (3) the evidence does, in fact, show that there was no emergency and that there has been a deliberate and bad faith violation, circumvention or frustration of those orders, these Courts will not hesitate to cite attorneys or judges before these Courts and find them in indirect criminal contempt.

## CONCLUSION

█ It is not often that either of these Courts is forced to exercise its inherent contempt powers. These Courts earnestly hope that this case sounds a clear warning to the bench and bar that behavior of the sort presented in this case will not be tolerated. Moreover, while only a fine was imposed here, these Courts also have the authority to impose prison terms, and quite likely will exercise this prerogative in the future. *In re Perrello*, (1973), 260 Ind. 26, 291 N.E.2d 698.

Finally, respondents Arthur, Richardson, Gray and McGaughey are charged with the costs of this case. These costs relate to preparation of the transcripts of the CHINS hearings in Pike County, and preparation of the transcripts from the contempt hearings before these Courts. The costs shall be paid to the Clerk of the Supreme Court and Court of Appeals of Indiana.