CITIZENS ACTION COALITION OF INDIANA, INC.; City of Terre Haute; and Save the Valley, Inc., Appellants (Intervenors Below),

v.

PUBLIC SERVICE COMPANY OF INDIANA, INC.; Office of the Utility Consumer Counselor; United Mine Workers of America District 11, Public Service Indiana Investors, Inc.; Industrial Energy Consumers Group; Wabash Valley Power Association; and Indiana Association of Cities and Towns, Appellees (Petitioners and Intervenors Below).

No. 93A02–8604–EX–115.

Court of Appeals of Indiana,
Third District.

April 12, 1990.
Rehearing Denied May 29, 1990.

Michael A. Mullett, Columbus, for appellant Citizens Action Coalition.

Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, for appellants City of Terre Haute and Save The Valley, Inc.

Jon D. Noland, Duejean C. Garrett, Public Service Company of Indiana, Inc., Plainfield, Virgil L. Beeler, Fred E. Schlegel, Mary M. Stanley, Baker & Daniels, Indianapolis, for appellee Public Service Company of Indiana, Inc.

Jerry Jacobi, Robert K. Johnson, Indianapolis, for appellee Office Of Utility Consumer Counselor.

HOFFMAN, Presiding Justice.

Intervenors-appellants Citizens Action Coalition of Indiana, Inc.; City of Terre Haute; and Save the Valley, Inc. (collectively referred to as "Citizens") appeal from the final order of the Public Service

Commission of Indiana[1] ("Commission") approving a settlement agreement negotiated by petitioner-appellee Public Service Company of Indiana, Inc. ("PSI") and intervenor-appellee Office of the Utility Consumer Counselor ("UCC"). In its order, the Commission authorized a rate increase to ameliorate PSI's precarious financial condition resulting from the abandonment of the Marble Hill nuclear project.

Citizens raises the following issues on appeal:

(1) Whether the Commission erred when it foreclosed inquiry into the prudence exercised by PSI in its management of the Marble Hill project.

(2) Whether the Commission erred by approving the accounting procedures identified below:

a. the authorization of an overall rate of return for PSI of 14.79%;

b. the retention by PSI of $75 million collected from ratepayers pursuant to an emergency rate surcharge; and

c. the allocation of PSI's income tax deductions for the Marble Hill abandonment loss and the Marble Hill interest expense to the investors.

(3) Whether the Commission deprived Citizens of its right to a fair and open hearing before an impartial decision-maker.

## I.

■ Citizens first alleges error in the Commission's ruling that prudence was an inappropriate standard to be applied in determining how best to alleviate the emergency situation with which PSI was confronted. In support of its argument, Citizens relies upon the maxim of rate-making that a utility may not recover through rates those costs attributable to management imprudence. *See West Ohio Gas Co. v. Public Utilities Commission of Ohio* (1935), 294 U.S. 63, 68, 55 S.Ct. 316, 319, 79 L.Ed. 761; *Board of Dir. for Util. v. Office of Utility* (1985), Ind.App., 473 N.E.2d 1043, 1053; *L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), 169 Ind.

App. 652, 657, 351 N.E.2d 814, 819. The validity of that maxim remains undisputed.

However, an inquiry as to the prudence of the expenses incurred in constructing Marble Hill was neither relevant nor necessary in the proceeding below. Whether the expenses were prudently or imprudently incurred, none of the costs expended by PSI for the failed Marble·Hill project were chargeable to the utility's ratepayers. *Northern Indiana Public Service Co. v. Citizens Action Coalition* (1989), Ind., 548 N.E.2d 153, 156.

## II.

■ For its second issue, Citizens challenges the Commission's approval of various accounting procedures proposed by PSI and UCC in their settlement agreement. Citizens contends, for example, that the Commission erred when it approved an overall rate of return for PSI of 14.79%.

The rate of return established by the Commission is a ratio of "return" to "rate base." *L.S. Ayres & Co., supra,* 169 Ind. App. 652, 659, 351 N.E.2d 814, 820. The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the "return" that is available to be distributed to the utility's investors. *Id.* at 657, 351 N.E.2d at 819. The "rate base" consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the return is to be earned. *Id.* at 658, 351 N.E.2d at 820. The Commission's primary objective is to ascertain whether the ratio of return to rate base is deficient, adequate or excessive, thereby establishing a fair rate of return. *Id.* at 659, 351 N.E.2d at 820–821.

The Commission in the instant proceeding made the following finding with respect to PSI's rate of return:

"[T]he Commission hereby determines that a fair rate of return for [PSI] is 9.90% on the fair value rate base of $2,396,291,000....

Although this produces a higher rate of return (14.79%) on the jurisdictional net

**1.** The Commission is now called the Indiana Utility Regulatory Commission.

original cost of PSI's property than that allowed in PSI's last general rate case (11.75%), we find that such higher return is justified by the extreme and unique emergency conditions confronting [PSI]....

When the Marble Hill investment is written off the books of the company, the equity account, sometimes referred to as a book value of equity, will result in a negative $283 million. Prior to the write-off, the company's equity account is $1.474 billion.... [I]t is essential, if this company is ever to be returned to financial health, that a rate of return be granted that takes into account the risk premium created by the radical contraction of the company's capital base. Such premium, according to witness Perry, can reasonably be as much as 3.25%. Based on the normal rate of return granted [PSI] in its last normal rate case, such premium would permit a return on original cost rate base in this proceeding of up to 15%. We find this to be within the range of reasonableness dictated by the statutory requirements inherent in this emergency situation."

The Commission evaluated the various risks which were unique to PSI and concluded that a risk premium should be added to the return normally allowed a utility. Citizens maintains that the Commission impermissibly shifted the costs of Marble Hill to the ratepayers by authorizing a rate of return that took into account the risk premium created by the failed project.

Although the Commission granted rate relief to PSI, the result was achieved with the specific exclusion from the rate base of the costs of the cancelled facility. The rate relief may have been required because of the cancellation of the Marble Hill nuclear project. However, the Commission made it clear that the costs of the project were not going to be recovered through the rate increase. The Commission did not violate the proscription against charging ratepayers with the costs expended by a utility for a power plant that never became used and useful property. *Accord Nat. Rural Util. Co-op. Fin. v. P.S.C.* (1988), Ind.App., 528 N.E.2d 95, 103 (discussing with approval the addition of a risk premium to the utility's normal return, as the result was reached with the specific exclusion from the rate base of the costs of the cancelled facility).

Citizens argues in the alternative that the rate of return of 14.79% was not supported by substantial evidence of record. According to Citizens, the risk premium authorized by the Commission was based upon the testimony of one witness, Perry, whose opinion was not supported by exhibits, surveys, comparisons or other data. Citizens characterizes Perry's testimony as a "scintilla of evidence."

■ The appropriate standard of judicial review of a Commission order has two levels. The Commission's decision must first contain specific findings of fact on all determinations material to its order. Secondly, the reviewing court must ascertain whether there is substantial evidence in light of the record to support the Commission's findings of fact. In reviewing the sufficiency of the evidence, the court on appeal will neither weigh the evidence nor substitute its judgment for that of the Commission. *Habig Trucking v. Public Service Com'n* (1984), Ind.App., 466 N.E.2d 484, 487.

■ Witness Perry testified that "[t]here should be a risk premium because of insolvency and thin equity position over the rate of return granted in the last general rate case of a range of a high of 3.25% to a low of 1% in the four year period." Additional evidence identified the unique risks faced by PSI: the inability to access short- and long-term capital markets, a serious cash flow deficiency, inflated cost of equity capital and insolvency. A review of the record confirms that there was sufficient evidence to support the Commission's addition of a risk premium to the normal rate of return.

■ The second accounting procedure to which Citizens takes exception resulted in the retention by PSI of $75 million collected from ratepayers pursuant to an emergency rate surcharge. In an order dated March 8, 1984, the Commission authorized a 5%

emergency rate surcharge for PSI. The Commission's order provided that the revenues from the surcharge "will be separately accounted for and will be deducted from the Marble Hill investment to be amortized." The amortization and recovery through rates of the sunk costs of a cancelled nuclear project were deemed impermissible by the Supreme Court in *Citizens Action Coalition v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610, 614. Consequently, the Commission ruled:

"The surcharge revenues previously collected will be retained by PSI and will be reflected in net income during the period collected...."

Citizens perceives the Commission's ruling as a breach of the terms of the settlement agreement upon which the emergency rate surcharge was based. Under the terms of the settlement agreement, the emergency rate surcharge was intended to serve two purposes: 1) to provide PSI with income to meet its franchise and contractual obligations and 2) to reduce the amount of the Marble Hill investment to be amortized.

The Commission determined that PSI met its obligations as they became due principally because of the 5% interim emergency surcharge. Moreover, the amount of the Marble Hill investment to be amortized was reduced to zero. Such a reduction was accomplished by operation of law and not by deduction of the surcharge revenues from the value of the investment. *See Citizens Action Coalition v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610, 614 (prohibiting amortization and the recovery through rates of the sunk costs of a cancelled nuclear project). Nonetheless, the intent of the settlement agreement was fully satisfied. The Commission's determination that the surcharge revenues should be reflected as net income during the period collected did not violate the agreement underlying the March 8, 1984 order.

■ An alternative argument raised by Citizens characterizes the Commission's ruling as an attempt to change retroactively the provisions of the March 8, 1984 order. Admittedly the order was changed to the extent that the surcharge revenues were not deducted from the Marble Hill investment to be amortized. Yet this change was the result of the Supreme Court decision prohibiting amortization and may not be viewed as a retroactive amendment by the Commission in excess of its statutory authority.

Citizens also alleges error in the Commission's approval of PSI's accounting and rate-making treatment of its income tax deduction for the Marble Hill abandonment loss and Marble Hill interest expense. PSI's abandonment during 1984 of its investment in Marble Hill produced a tax loss well in excess of PSI's 1984 taxable income. Hence a net operating loss was generated which could be carried back to each of the three preceding years and forward for up to fifteen years to offset future taxable income. Additionally, PSI incurred $183.8 million in deductible interest expense. Because the deductions were associated with the Marble Hill nuclear project, the Commission assigned the tax benefits to the shareholders who funded the construction.

■ Citizens avers that the Commission erred by allocating the income tax deductions in such a way as to create a hypothetical tax liability for rate-making purposes. A fundamental principle in rate proceedings is that the Commission may not fix rates based upon a hypothesis or a situation never in existence. *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 91, 131 N.E.2d 308, 317. From this general rule is derived the requirement that the Commission make some determination of the actual tax liability of the utility rather than use a hypothetical figure. *See Federal Power Commission v. United Gas Pipe Line Co.* (1967), 386 U.S. 237, 244, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18; *Office of Utility Consumer Counselor v. Indiana Cities Water Corp.* (1982), Ind. App., 440 N.E.2d 14, 15–16; *Office of Public Counselor v. Indiana & Michigan Electric Co.* (1981), Ind.App., 416 N.E.2d 161, 168; *City of Muncie v. Public Service*

*Commission* (1978), 177 Ind.App. 155, 158, 378 N.E.2d 896, 898.

■ Yet this Court has allowed the Commission to depart from a determination of actual tax liability when the savings in income tax are realized through deductions associated with construction.

"[T]he Commission is prohibited from including the value of the construction work in progress in the utility's rate base, for such property has not yet achieved the status of property *'actually used and useful* for the convenience of the public.' Because the construction work in progress is not included in the rate base, the customer is not paying any return on the investment. Therefore, since the customer is neither contributing to the costs of work in progress nor paying any return on the investment in that work, he should not be entitled to the tax benefits associated with the construction costs. Those benefits should in fact be passed on to the investor as a return on his capital." [Citations omitted.] *Capital Improvement Bd. etc. v. P.S.C.* (1978), 176 Ind.App. 240, 270, 375 N.E.2d 616, 637; *see also Office of Utility Consumer Counselor v. P.S.C.* (1983), Ind.App., 449 N.E.2d 604, 607.

The rationale behind the exception for construction-related deductions is equally applicable to deductions associated with a cancelled nuclear project. The value of the nuclear project may not be included in the utility's rate base, as the property never achieved the status of property actually used and useful for the convenience of the public. *See Citizens Action Coalition v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610, 614. In addition, the customer may not be asked to contribute to the costs of the failed project. *See id.* The customer, therefore, is not entitled to the tax benefits associated with the cancellation of a nuclear project. *Accord Nat. Rural Util. Co-op. Fin. v. P.S.C.* (1988), Ind.App., 528 N.E.2d 95, 103 (viewing the assignment to the investors of the tax benefits associated with the cancellation of a nuclear project as evidence that the ratepayers were not being held respon-

sible for the costs of the failed project). There was no error in the Commission's order assigning the income tax deductions to the investors for rate-making purposes.

## III.

■ The final issue brought before this Court states that the Commission deprived Citizens of its right to a fair and open hearing before an impartial decision-maker. According to Citizens, bias on the part of the Commission was demonstrated by the following:

1. Commission Chairman Montgomery privately communicated with the officers of two banks which were co-managers of PSI's revolving credit facility;

2. The Commission stated in its ruling on the motion to dismiss PSI's petition for permanent rate relief that the Commission had anticipated the need for such relief;

3. Commission Chairman Montgomery remarked during cross-examination of a PSI witness, "We are not here in the business of impeaching witnesses or cutting at their credibility. . . .";

4. Commission Chairman Montgomery engaged in communications with members of the Governor's staff;

5. The Commission denied Citizens' motion for an extension of time to conduct discovery;

6. The Commission admitted into evidence written testimony which had been pre-filed only four days in advance of the hearing; and

7. The Commission considered rate relief scenarios developed by staff members, which exhibits were not a part of the record.

Citizens first urges this Court to infer bias from a luncheon meeting between Commission Chairman Montgomery and the officers of two banks that had a financial interest in the outcome of the proceeding below. To support its position, Citizens relies upon the due process requirement codified at IND. CODE § 8–1–1–5(e) (1988 Ed.):

"Except as otherwise provided in this chapter, no member or employee of the commission assigned to make findings of fact and conclusions of law in a formally docketed evidentiary proceeding may communicate in connection with any issue of fact or law disputed in that proceeding with any party or his representative, except on notice and with opportunity for all parties to participate."

Because the banks were not parties to the proceeding, Commission Chairman Montgomery's meeting with officers of the banks did not violate IND. CODE § 8–1–1–5(e). An inference of bias on the basis of that luncheon meeting is not sustainable.

 Citizens next asserts that the Commission became a proponent for PSI on the issue whether PSI would receive rate relief in addition to the 5% interim surcharge. Citizens focuses upon the following language in the Commission's ruling on a motion to dismiss PSI's petition for permanent rate relief:

"It has always been anticipated that more permanent rate relief would be required to achieve that goal [of returning PSI to some semblance of financial health]."

An examination of the Commission's ruling, in its entirety, discloses that the Commission was not advocating rate relief. Rather, the Commission was commenting upon the continued threat to PSI's financial integrity.

 Remarks made by Commission Chairman Montgomery during cross-examination of a PSI witness are cited by Citizens as evidence that the Commission disregarded its duty to judge the credibility of the witnesses. The chairman stated,

"I would simply make the observation from the Commission's point of view that we are in an administrative forum rather than a trial court, and for those of you who are perhaps not used to operating in front of administrative bodies, it is very different from a trial court setting. There is no jury that needs to be convinced. The Commission is a very different type of setup and while we recognize that there will be probably no more important case to come before us this year. If fact A and fact B are established, the Commission is quite capable of drawing conclusions from those facts. We are not here in the business of impeaching witnesses or cutting at their credibility or badgering them or, in fact, impeaching them."

Immediately following the chairman's remarks, the presiding Chief Administrative Law Judge clarified that "impeachment does have a place in this proceeding to the extent that it bears on the weight and credit to be given a piece of evidence." Moreover, the Commission specifically referred to the credibility of the witnesses in its final order:

"A majority of the Commission has attended virtually all of the evidentiary hearings and has thus observed the demeanor and credibility of the witnesses in reaching the findings set forth herein."

The Commission fully discharged its duty to assess witness credibility.

 Citizens returns to IND. CODE § 8–1–1–5(e) in its argument that bias was evidenced by ex parte communications between Commission Chairman Montgomery and members of the Governor's staff. The Governor's legal counsel asked Montgomery to delay issuing a decision in the proceeding so that UCC and PSI could negotiate a settlement. The Governor's executive assistant privately asked Montgomery to allow sufficient time and notice for a fair hearing on the settlement. Citizens stresses that the members of the Governor's staff were acting at the behest of and on behalf of UCC, a party to the proceeding.

Yet even if the staff members were representatives of UCC, their conversations with Commission Chairman Montgomery were not condemned by IND. CODE § 8–1–1–5(e). That statute prohibits ex parte communications as to "any issue of fact or law disputed." The conversations recounted by Citizens did not involve disputed issues of fact or law.

For its next allegation of bias, Citizens complains that the Commission denied its motion for an extension of time to conduct discovery regarding the settlement agreement negotiated by UCC and PSI. On January 31, 1986, UCC petitioned for a hearing to consider new evidence, namely the settlement agreement between UCC and PSI. The hearing was set for February 24, 1986, and a discovery deadline of February 14, 1986 was established. Citizens moved for an extension of time to March 27, 1986, to discover evidence relating to UCC's petition to adopt the settlement agreement. No extension of time was granted.

An examination of the record indicates that Citizens had been apprised concerning the on-going negotiations for a settlement of the case. Citizens had taken depositions, submitted interrogatories and sought the production of documents relating to the settlement agreement. By denying Citizens' motion to extend the period for discovery, the Commission neither abused its discretion nor demonstrated bias.

Citizens suggests that the impartiality of the rate proceeding was undermined when the Commission admitted into evidence written testimony which had been pre-filed only four days in advance of the hearing. Citizens contends that such leniency on the part of the Commission was in violation of the rules governing the proceeding.

The rule to which Citizens refers is found at 170 I.A.C. 1–1–17(j):

"The direct testimony of a witness may be presented in writing. Such written testimony shall be prepared in question and answer form and shall be accompanied by any exhibits to which the testimony relates. In any utility rate proceeding, *unless otherwise provided in any prehearing conference order* or by stipulation of the parties, such prepared testimony and exhibits shall be filed with the Commission and served on all parties at least fifteen (15) days prior to the date of the hearing at which the same is to be offered into evidence." [Emphasis added.]

Discretion on the part of the Commission in ordering the pre-filing of testimony closer to the hearing date is contemplated by the rule. The Commission in the proceeding below exercised such discretion. In a docket entry dated February 7, 1986, the Commission provided for the pre-filing of any written evidence four days in advance of the hearing. A finding of bias may not be premised upon the Commission's admission into evidence of testimony pre-filed in accordance with its docket entry.

Lastly, Citizens alleges bias because the Commission considered rate relief scenarios developed by Commission staff members, which exhibits were not made a part of the record. According to Citizens, the consideration of such rate relief scenarios constituted reliance upon evidence not in the record.

The rate relief scenarios consisted of "mathematical worksheets based upon evidence of record which provide no narrative description, analysis or recommendation, and in no way comment on the quality or nature of the underlying evidence." The Commission explained that the function served by the rate relief scenarios in the final analysis was of minimal importance:

"Based upon our expertise and relying wholly upon evidence contained in the record, the Commission has considered other rate relief scenarios to further evaluate the reasonableness of the rate relief proposed in the Settlement Agreement."

Certainly, the better practice would have been for the Commission to make the rate relief scenarios part of the record, pursuant to IND. CODE § 8–1–1–5(b) (1988 Ed.). The inquiry is whether Citizens was denied a fair and impartial hearing, however. The Commission's consideration of the rate relief scenarios did not serve to deprive Citizens of a hearing before an impartial decision-maker.

The order of the Commission is affirmed.

GARRARD, J., concurs.

BAKER, J., dissents with opinion.

BAKER, Judge, dissenting.

I dissent.

In an attempt to entomb the travesty of Marble Hill, the Commission has engaged in legerdemain, which the majority today affirms.

The majority has allowed the Commission to grant PSI a risk premium based on the Commission's finding that PSI's financial difficulties amount to an emergency. *Commission Order* of 3/7/86 at 14. I find the majority's reasoning flawed in two respects.

## I.

First, as the majority correctly notes, a utility cannot shift to its rate payers the investment burdens of an abandoned project that never became used and useful property of the utility. *Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co.* (1985), Ind., 485 N.E.2d 610. In determining a reasonable rate of return for PSI, the Commission excluded from PSI's rate base the costs of the Marble Hill project. This did not satisfy the requirements of *Citizens Action Coalition, supra,* however, because PSI's financially dire straits are directly attributable to the Marble Hill fiasco. The Commission relied on evidence that PSI's writing off of Marble Hill "could bring PSI precariously close to bankruptcy." *Commission Order, supra,* at 13. Moreover, in his concurrence with the order, Commissioner O'Lessker noted:

> We should not let ourselves be deceived by our own rhetoric about the disposition of the Marble Hill issue. The company, the consumer counselor, and the language in this order all give the impression that Marble Hill is behind us and that the rate payers will never have to bear its financial burdens. This interpretation of what we are doing here today seems to me, at best, disingenuous. The plain fact of the matter is that both the 5% emergency surcharge granted in 1984 and the 8.2% increase we are approving today are directly attributable to the financial catastrophe that Marble Hill became.

*Appellant's Brief* at 23–24. In essence, then, the Commission's order provides for exactly that which is prohibited; that is, the recovery of costs for property that never became used and useful, thereby violating the rule of *Citizens Action Coalition, supra.* See also *L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), 169 Ind.App. 652, 351 N.E.2d 814, and *Public Ser. Comm. v. Indiana Bell Telephone Co.* (1955), 235 Ind. 1, 130 N.E.2d 467.

The emergency for which the Commission granted relief is a crisis of confidence in the capital and credit markets. Because of the Marble Hill losses, PSI has had difficulty in accessing short and long term credit and long term capital, its investment ratings have suffered, and its earnings have declined. *Commission Order* of 3/7/86 at 14. By granting the risk premium, however, the Commission has improperly made PSI's consumers the insurers of PSI's investors. The Commission regulates utilities "to protect the consumers from the abuses of monopoly i.e. artificially high prices." *Citizens Action Coalition, supra,* 485 N.E.2d at 614. The Commission has a responsibility to approximate the conditions of a competitive market in the monopoly market of public utilities. In discharging this responsibility, the Commission of necessity, takes into account the responsibilities of utility investors and consumers. *Id.* at 614, 615. The responsibilities of consumers include paying a fair return on investor's capital, and paying taxes and operating costs. *Citizens Energy Coalition v. Ind. & Mich. Elec. Co.* (1979), Ind.App., 396 N.E.2d 441, 445, *trans. denied.* It is well established, however, "that the company's *investors, not* the consumers, must contribute the working capital." *Id.* (emphasis added). The Commission's order illegally places the burden of acquiring capital squarely on the consumer and should not be allowed.

## II.

Second, the majority erroneously concludes that a prudence inquiry was not required because "[w]hether the expenses were prudently or imprudently incurred,

none of the costs expended by PSI for the failed Marble Hill project were chargeable to the utility's rate payers." *Majority Opinion* at 837. If the majority is correct that the costs of Marble Hill are not being shifted to the rate payers, then an inquiry was required to determine management's prudence not relating to Marble Hill, but rather within the context of the financial emergency alone. If an inquiry reveals no imprudence in the precipitation of the emergency, then rate relief is proper. An inquiry into management's prudence in the context of the emergency was required here for two reasons.

First, IND. CODE § 8–1–2–48 places the Commission under an affirmative duty to inquire into a utility's management practices and to exclude any item of expense which is unnecessary or excessive in setting that utility's rates. The duty imposed by IND. CODE § 8–1–2–48 is absolute and continuous: "[t]he commission *shall inquire* into the management of the business of *all* utilities ..." (emphasis added). This is not precatory language. "The use of the word 'shall' in a statute must be construed as being used in its imperative and mandatory sense." *American Vitrified Prod. Co. v. Public Serv. Comm.* (1961), Ind.App., 176 N.E.2d 145, 153, 40 P.U.R.3d 164, 174 (citing *State ex rel. City of Indianapolis v. Brennan, Judge* (1952), 231 Ind. 492, 498, 109 N.E.2d 409, 411). Surely, in a situation in which the Commission grants a utility between $450 million and $720 million in rate increases, the requirements of IND. CODE § 8–1–2–48 apply and mandate a prudence inquiry.

The Commission was also obliged to inquire into the prudence of PSI's management because the provisions of IND. CODE § 8–1–2–113 do not allow for emergency rate relief when management imprudence causes the emergency. In *State ex rel. Indianapolis Traction & Terminal Co. v. Lewis* (1918), 187 Ind. 564, 120 N.E. 129, our supreme court required the Public Service Commission to take jurisdiction over a petition for emergency relief by a streetcar company whose ability to provide service and make a profit had been ravaged by the inflation caused by World War I. The court specifically disclaimed any requirement that the Commission hear an emergency petition based solely on threatened insolvency because such a "condition may have arisen through negligent or careless management, lack of business capacity, or otherwise, and far from being within the meaning of the word 'emergency' as used in the statute." 187 Ind. at 572, 120 N.E. at 131. We in the appellate courts are bound by this cautionary message. Under *Lewis*, a petitioner must allege more than mere insolvency for the Commission to take jurisdiction over a petition for emergency relief. When the Commission does take jurisdiction, therefore, it cannot grant relief on the basis of insolvency resulting from imprudence.

Here, PSI sought relief based on a financial emergency threatening insolvency. Before the Commission could grant emergency relief in this situation, it had to conduct a prudence inquiry to comply with IND. CODE § 8–1–2–48 and the rule of *Lewis, supra.*

I dissent and would reverse and remand with instructions to the Commission to permit a prudence inquiry.