CITIZENS ACTION COALITION OF INDIANA, INC., City of Terre Haute, Save the Valley, Inc. and Virgil and Sara Bowling, Appellants,

v.

PUBLIC SERVICE COMPANY OF INDIANA, INC. and Office of the Utility Consumer Counselor.

No. 93S02–9111–EX–940.

Supreme Court of Indiana.

Nov. 27, 1991.

Michael A. Mullett, Columbus, for Citizens Action Coalition of Indiana, Inc.

Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Robert F. Hellmann, Terre Haute, for City of Terre Haute.

Jon D. Noland, Duejean C. Garrett, Ronald J. Brothers, Public Service Com. of Indiana, Inc., Virgil L. Beeler, Fred E. Schlegel, Mary M. Stanley, Ronald D. Gifford, Baker & Daniels, Indianapolis, for Public Service Co. of Indiana, Inc.

DeBRULER, Justice.

In 1984, Public Service Company of Indiana (PSI) abandoned the construction of its Marble Hill nuclear power generating station, which resulted in a net operating loss to PSI of $1.4 billion. In March of 1986, the Public Service Commission (Commission)[1] entered a rate order which was designed to allow PSI to maintain operations, regain access to long and short term capital markets at reasonable rates, and avoid insolvency. One of the provisions of this order allowed PSI to record a so-called "regulatory asset" of $475 million dollars, which consisted of the federal income tax savings to be realized by PSI by deducting its loss from its taxable income. The March 1986 order was based on the 46% federal corporate tax rate in effect at that time. The rates set by this order would provide PSI with sufficient revenues, ergo taxable income, to exhaust the regulatory asset during the time period of 1986-1989. This four-year period coincided with the period for which the Commission had set emergency rates for PSI and during which a moratorium was imposed on PSI restricting its ability to seek further rate increases.

An appeal of the March 1986 order was taken by Citizens Action Coalition of Indiana, Inc., the City of Terre Haute, Save the Valley, Inc., and Virgil and Sara Bowling (collectively referred to herein as CAC). The Indiana Court of Appeals upheld the Commission's order in *Citizens Action Coalition v. Public Serv. Co. of Ind.* (1990), Ind.App., 552 N.E.2d 834 (*PSI* I). In regard to CAC's claim that the Commission erred in its treatment of the regulatory asset, the Court of Appeals held:

Because the deductions were associated with the Marble Hill nuclear project, the Commission assigned the tax benefits to the shareholders who funded the construction.

. . . .

The value of [a cancelled] nuclear project may not be included in the utility's rate base, as the property never achieved the status of property actually used and use-

ful for the convenience of the public. *See Citizens Action Coalition v. Northern Indiana Public Service Co.* (1985), Ind., 485 N.E.2d 610, 614. In addition, the customer may not be asked to contribute to the costs of the failed project. *See id.* The customer, therefore is not entitled to the tax benefits associated with the cancellation of a nuclear project. . . .

*Id.* at 839-40. By virtue of a split vote by the members of this Court, CAC's petition for transfer was denied (2-2, Krahulik, J., not participating), which had the effect of making the decision of the Court of Appeals the law of the case. *Matter of Lemond* (1980), 274 Ind. 505, 413 N.E.2d 228.

After the Commission's entry of its March 1986 order, Congress enacted the Tax Reform Act of 1986 and, in order to assess its impact on Indiana utilities, the Commission established an executive committee to conduct an investigation and to file a report of its conclusions with the Commission. The executive committee concluded that because the Tax Reform Act reduced the federal corporate tax rate from 46% to 34%, the Act would effect an overall reduction of federal tax expenses for Indiana utilities as a whole. Upon the recommendation of the committee, the Commission adopted a procedure by which it would determine whether and to what extent the retail rates of each individual utility in Indiana should be altered in light of the Tax Reform Act.

The Commission scheduled a series of public hearings and established a separate sub-docket for each utility, at which time the Commission was to receive the committee's recommendation as to that utility as well as any other evidence pertinent to its decision. If the Commission determined that the Tax Reform Act effected a reduction in a utility's operating expenses, by virtue of reduced tax expenses, that utility could then petition for a second hearing at which it would be afforded an opportunity to show cause why its retail rates ought not be concurrently reduced. Relevant to

1. Utility Regulatory Commission.

this appeal, the committee also recommended that utilities which had received a general rate order subsequent to January 1, 1986, in which the Commission had considered the effects of the Tax Reform Act be excepted from this procedure. The following provision from the March 1986 order brought PSI within the purview of the recommended exception:

In the event that Federal or State income tax rates decrease during the 1986–1989 time period from the combined Federal and State Income tax rate of 48.16% utilized in establishing the rates herein, no adjustment in PSI's retail rates will be made for such a reduction; however a charge to cost of service in lieu of tax expense shall be recorded as a further reduction of the regulatory asset in each applicable year. Such charge shall be equal to the difference between the tax benefits realized by PSI in such year and the tax benefits which would have been realized if computed at the combined statutory tax rate of 48.16%.

On May 13, 14, and 15, 1987, the public hearings were conducted. The sole issue addressed by the Commission in its consideration of each sub-docket of these hearings was whether the Tax Reform Act necessitated an adjustment of the retail rates charged by that sub-docket's utility. Prior to the hearing, PSI filed a motion that the Commission take administrative notice of its March 1986 order for purposes of incorporation into the record of the present proceeding. During the PSI sub-docket, that motion was granted. At that time, PSI submitted a memorandum of law which argued that the provision of the March 1986 order quoted above had addressed the possibility of a reduction in tax rates and had precluded any alteration in PSI's retail rates based on such a reduction in order to assure that PSI had taxable income sufficient to exhaust the regulatory asset, that the March 1986 order was still in effect and controlled the outcome of the present proceeding, and that therefore its rates should not be altered. PSI also cited to the recommendation of the executive committee that the Commission forego further review of the impact of the Tax Reform Act on utili-

ties already subject to 1986 rate orders in which the possibility of a tax rate reduction had been considered. CAC was neither a party to nor an intervenor in this cause. Ratepayers were represented at the hearing by the Office of the Utility Consumer Counselor (UCC). It appears from the record submitted to this Court that the UCC offered no testimony, evidence, or exhibits whatsoever either in favor of or in opposition to the arguments made by PSI. The UCC's brief in opposition to CAC's petition to transfer indicates that the UCC "acquiesced" in PSI's position.

On June 1, 1987, the Commission entered a rate order covering each Indiana utility in the wake of the Tax Reform Act. The following provision of the order was made in regard to PSI:

5. No reduction in Public Service Indiana's retail electric rates, as a result of the Tax Reform Act of 1986, shall be directed. However, Public Service Indiana shall abide by the terms and conditions of our [March 1986 order] and reduce the regulatory asset in the fashion mandated by that Order to reflect the reduction in the applicable Federal Income Tax rate.

CAC filed a timely appeal of this ruling in the Indiana Court of Appeals pursuant to I.C. 8–1–3–1, which accords a right to judicial review of actions taken by the Commission to "[a]ny person, firm, association, corporation, city, town or public utility adversely affected by any final decision, ruling, or order of [the Commission.]" CAC's assignment of errors alleged that the Commission's decision not to reduce PSI's retail rates in response to the Tax Reform Act was contrary to law, and in its brief before the Court of Appeals, CAC set out that its allegation of error was premised on a negative answer to the following two questions:

1. Whether the Public Service Commission may authorize an investor-owned public utility to include in customer rates a charge in lieu of tax expense equal to the difference between tax expense calculated at the former federal income tax rate and tax expense calculated at the new federal income tax rate, where the

charge corresponds to no actual expense incurred or to be incurred by the utility? 2. Whether the Public Service Commission may lawfully adopt in a current order a conclusion from a prior order entered fifteen months earlier that a public utility not reduce its rates in the event of a decrease in the state or federal income tax rate without any evidence being introduced in the current cause to show the conclusion was currently just and reasonable?

The Court of Appeals, however, did not reach the merits of CAC's appeal, finding that CAC was precluded from attacking the Commission's order on the grounds asserted because those arguments had not been presented to the Commission by any party or intervenor below. *Citizens Action Coalition of Ind. v. Public Serv. Co. of Ind.* (1990), Ind.App., 556 N.E.2d 328 (*PSI* II). We now grant CAC's petition for transfer and vacate the decision of the Court of Appeals.

■ Judicial review of decisions of the Commission is guaranteed both by statute and by case law. I.C. 8-1-3-1 sets out that any person or entity adversely affected by a Commission decision may bring an appeal based on the following pleading:

> An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

In *Citizens Action Coalition of Ind. v. Northern Ind. Pub. Service Co.* (1986), Ind., 485 N.E.2d 610 (*NIPSCO* I), this Court summarized the multiple-tiered standard of review under which decisions of the Commission are evaluated:

> In addition to determining whether or not the decision, ruling or order of the Commission is supported by specific findings of fact and by sufficient evidence, there is another matter in which this Court may always properly inquire, and that is the question of whether or not the decision, ruling or order is contrary to law. See *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308, 312. In other words, did the Commission stay within its jurisdiction and conform to the statutory standards and legal principles involved in producing its decision, ruling or order. See [*id.* at 83–84], 131 N.E.2d at 313.

*Id.* at 612–13. PSI cites our recent case of *National Rural Utils. Coop. Finance Corp. v. Public Serv. Comm'n* (1990), Ind., 552 N.E.2d 23, 29, for the proposition that "an appellate court will not review issues on appeal that were never before, and therefore never ruled upon, by an administrative body," and argues that the issues raised by CAC were never presented to nor ruled upon by the Commission. PSI urges, therefore, that this Court should resolve this appeal on procedural grounds, as did the Court of Appeals. We decline to do so, however, as we find that the merits of CAC's appeal are properly the subject of appellate judicial review.

To use an old cliche, both the Court of Appeals and PSI have missed the forest for the trees. The issue presented to the Commission for its determination was whether PSI's retail rates should be lowered to reflect the decrease in that utility's operating expenses as a result of the lowered federal corporate tax rate occasioned by the Tax Reform Act. After reaching its decision that PSI's rates should not be lowered, the Commission entered its June 1987 order to that effect and ordered further that PSI follow the directives of its May 1986 order which had contemplated such a reduction in tax rates. The issue presented on appeal is whether that part of the June 1987 order pertaining to PSI was proper. Under I.C. 8-1-3-1, CAC's pleading that the Commission's order was "contrary to law" was adequate to place this issue before the appellate tribunal. In order to resolve the issue, the appellate court goes to the three-part standard of review set by the statutory and case law cited above and assesses the sufficiency of the facts and evidence upon which that order was based and the propriety of the order in terms of whether the Commission acted within the scope of its jurisdictional and legal boundaries.

■ PSI contends that language from I.C. 8–1–3–1 itself precludes CAC from advancing the arguments set out in its brief. The pertinent provision states that any person or entity adversely affected by a Commission decision "may ... appeal to the court of appeals of Indiana for errors of law *under the same terms and conditions as govern appeals in ordinary civil actions....*" (Emphasis added.) PSI interprets the highlighted language to equate the issues which may be raised on appeal with the arguments which may be made in pursuit of the desired resolution of those issues and to limit the arguments available to one invoking I.C. 8–1–3–1 to those which were made before the Commission by a party or intervenor at the hearing below. In support of this interpretation, PSI cites *Hooten v. Alt* (1963), 244 Ind. 93, 191 N.E.2d 13, and *Rogers v. Rogers* (1982), Ind.App., 437 N.E.2d 92, for the proposition that issues may not be raised for the first time on appeal. First, as pointed out above, the issue being appealed by CAC is the selfsame issue that was presented to the Commission, namely, whether PSI's retail rates should have been lowered as a consequence of the reduction of the federal income tax rate.

Second, notwithstanding the contention of PSI to the contrary, this interpretation of I.C. 8–1–3–1 effectively requires potential appellants to intervene in the Commission proceeding in order to preserve for appeal specific arguments which may be made that the Commission's decision was in error. PSI maintains that adversely affected ratepayers who fail or choose not to intervene in proceedings before the Commission may bring an appeal from a rate order under the statute, but that in that appeal the ratepayer may challenge the order only on grounds advanced by one of the parties or intervenors which appeared before the Commission. The situation at hand illustrates the miscreant nature of this position. Only one argument was advanced in the proceeding below, and that argument was to make no adjustment to PSI's retail rates despite a 12% drop in one category of that utility's operating expenses. According to PSI, adversely af-

fected ratepayers indeed had the right to appeal the Commission's order as erroneous but, unfortunately, no arguments upon which to base their appeal remained viable because all parties and intervenors were in agreement that this was the appropriate treatment of PSI in the wake of the Tax Reform Act. In order to assure the proper preservation of arguments to be made on appeal under PSI's interpretation of the statute, CAC, or any other party who might later consider itself to be "adversely affected" by the Commission's decision and wish to avail itself of the opportunity for judicial review afforded by I.C. 8–1–3–1, would have to intervene in the proceeding and make sure those particular arguments were made even though such participation is not a prerequisite to appeal under the terms of the statute. PSI's interpretation of I.C. 8–1–3–1 makes a sham of the right to challenge a Commission decision subsequent to the proceeding that the legislature has afforded to all ratepayers, whether participants in the Commission proceeding or not, and it effectively forecloses judicial review of a Commission decision if those appearing before the Commission enter into what amounts to a consent decree. This is clearly an intolerable result.

■ Finally, the decision of the Court of Appeals in *PSI* I poses no procedural bar to our consideration of the merits of this appeal under the doctrine of the law of the case. That doctrine

> stands for the proposition that an appellate court's determination of a legal issue is binding in subsequent appeals given the same case and substantially the same facts, *Cha v. Warnick* (1985), Ind., 476 N.E.2d 109, 114, and is "based upon the sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750, 760–61 (1950) (citations omitted).

*State v. Lewis* (1989), Ind., 543 N.E.2d 1116, 1118. Further, the law of the case doctrine makes only those issues directly decided by the Court of Appeals binding in

subsequent proceedings in that case. *Matter of Lemond,* 274 Ind. at 510, 413 N.E.2d at 232. First, this is not a subsequent proceeding in *PSI* I; under review in that case was the Commission's order in Cause No. 37414, the May 1986 order, which has now been fully adjudicated and has come to rest. Presented for review here is the Commission's order in an entirely distinct proceeding, Cause No. 38194-135, the June 1987 order, part of which incorporated and triggered the implementation of a conditional provision of the earlier order. Further, in *PSI* I, the Court of Appeals determined only the question of whether the tax benefits generated by the exhaustion of the regulatory asset should accrue to the shareholders or to the ratepayers of PSI. The question presented here also concerns the exhaustion of the regulatory asset, but goes to the propriety of the accounting practices by which the Commission directed PSI to exhaust the asset, a matter not even addressed, much less directly decided by the Court of Appeals in *PSI* I.

▇ We turn now to the merits of this appeal. The gravamen of CAC's first argument is that the Commission acted beyond its legal authority by failing to recognize the decrease in PSI's actual operating expenses by way of a corresponding rate reduction in its June 1987 order. CAC argues that the "charge to cost of service in lieu of tax expense," the accounting device by which the Commission ordered PSI to continue the exhaustion of the regulatory asset, is a disguised charge to ratepayers which allows PSI to recoup some of its Marble Hill losses through retail rates. We agree.[2]

The June 1987 order appealed from here provided that, irrespective of PSI's reduced tax expense occasioned by the 1986 Tax Reform Act, that PSI's retail rates would remain at the level set by the Commission in its May 1986 order and directed the implementation of the procedure set out in that earlier order which governed the exhaustion of the regulatory asset should

there be a decline in the state or federal tax rates. The key provision read:

> In the event that Federal or State income tax rates decrease during the 1986–1989 time period from the combined Federal and State Income tax rate of 48.16% utilized in establishing the rates herein, no adjustment in PSI's retail rates will be made for such a reduction; however a charge to cost of service in lieu of tax expense shall be recorded as a further reduction of the regulatory asset in each applicable year. Such charge shall be equal to the difference between the tax benefits realized by PSI in such year and the tax benefits which would have been realized if computed at the combined statutory tax rate of 48.16%.

In 1986, the Commission was faced with the task of fashioning an emergency rate order that would prevent the demise of a major Indiana public utility. To that end, the Commission devised the creation of the regulatory asset, consisting of the $475 million in federal tax savings which would result from the deduction of the $1.2 billion net operating loss from PSI's taxable income. These future tax benefits were to be carried on PSI's books as a depletable asset. The Commission's plan was to have the regulatory asset completely exhausted by the time the terms of the emergency rate order expired on December 31, 1989. The Commission set PSI's emergency retail rates at a level sufficient to secure the approval of the Securities and Exchange Commission to record the asset and to guarantee that PSI would have enough revenues to generate sufficient taxable income against which to deduct its loss and deplete the regulatory asset in that space of time.

The Commission's May 1986 order was based on an assumed federal tax rate of 46%, which was the tax rate in effect at the time the order was entered, and the order anticipated the exhaustion of the $475 mil-

---

**2.** Because we find reversible error on this point, we do not address the question raised by CAC's second argument, namely, whether the Commission may incorporate a provision from a pre-existing order into a subsequent order in the absence of submission of updated evidence showing that the provision leaves retail rates at a level which is just and reasonable.

lion[3] regulatory asset in the form of loss deductions of $118.75 million taken against PSI's taxable income in each of the four years covered by the emergency rate order. After the Tax Reform Act went into effect in 1987, the federal tax rate fell from 46% to 34%, and therefore the tax benefits actually to be realized likewise would have fallen by 12% to $104.5 million. The June 1987 order, however, invoked the conditional provision of the May 1986 order, and the regulatory asset for that and subsequent years continued to be depleted by $118.75 million, reflected on PSI's books as a $104.5 tax loss deduction and a 14.25 million "charge to cost of service in lieu of tax expense."

In *City of Evansville v. Southern Ind. Gas & Elec. Co.* (1976), 167 Ind.App. 472, 478, 339 N.E.2d 562, 568, the Court of Appeals stated that the primary objective of rate proceedings is to establish a "level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors."[4] The Court of Appeals also cited the following as a "simple mathematical formula for the expression of a utility's total revenue requirement":

$$R = O + (V - D)r$$

where R is the total revenue required,

O is the operating costs,

V is the gross value of the tangible and intangible property,

D is the accrued depreciation of the tangible and reproducible property,

and r is the rate of return.

*Id.* at 482 n. 7, 399 N.E.2d at 570 n. 7 (quoting C. Phillips, The Economics of Regulation 131 (1965)). This Court has noted that operating expenses which are recoverable by a utility through retail rates include wages, salaries, fuel, and maintenance plus annual charges for operating taxes. *NIPSCO* I, 485 N.E.2d at 614. The so-called "charge to cost in lieu of service," is couched in the Commission's order in terms of an accounting technique designed

merely to continue the exhaustion of the regulatory asset on schedule. The actuality is that effect of this provision artificially inflated PSI's operating expenses such that the outcome of the revenue equation remained the same despite a significant decrease in one item making up the "O" variable.

This is nothing but a new head of Hydra, yet another manifestation of the "extraordinary cost of service" which this Court condemned in *NIPSCO* I. In that case, the Commission granted a rate increase to NIPSCO which included amortized costs of an abandoned nuclear power project. The Commission found that the abandonment constituted an "extraordinary cost of service loss" incurred by NIPSCO in pursuit of its duty to serve the public and therefore recoverable through retail rates. This Court rejected the Commission's characterization, holding that the order placed an additional charge on consumers beyond that which is allowed by I.C. 8–1–2–1, the rate-making statute. *Id.* at 614. The nature of the wrongful additional charge placed on PSI ratepayers by the order at issue here is more elusive than the one at issue in *NIPSCO* I. In that case, the Commission expressly authorized a charge to NIPSCO ratepayers which openly compensated the utility for its loss. The order here appears innocuous because there is no levy of an outright charge; the June 1987 order ostensibly imposed no additional charge on PSI's ratepayers, but rather simply left in place rates which had previously been determined to be appropriate and which provided for an anticipated change in the tax rate. However, by refusing to acknowledge by way of a rate reduction the occurrence of an event which caused a significant decrease in PSI's operating expenses and which would otherwise necessitate a reevaluation and downward adjustment of retail rates, the Commission imposed a hidden additional charge on PSI ratepayers which is likewise not allowed by

3. All dollar figures cited herein are approximations.

4. Under the terms of the May 1986 order, PSI investors were to forego receiving a return on

their investment during the period covered by the emergency rate order to keep the utility solvent.

the rate-making statute and which was in direct contravention of this Court's holding in *NIPSCO* I. To the extent that PSI ratepayers have overpaid by virtue of this hidden charge, they are due a refund.

That part of the Commission's June 1987 order pertaining to PSI is vacated and, pursuant to this Court's decisions in *NIPSCO* I and *Northern Ind. Public Serv. Co. v. Citizens Action Coalition* (1989), Ind., 548 N.E.2d 153 (*NIPSCO* III), this cause is remanded to the Commission to determine rates after July 1, 1987, without including any charge to cost of service in lieu of tax expense attributable to the Tax Reform Act, and for any further orders necessitated thereby.

DICKSON and KRAHULIK, JJ., concur.

SHEPARD, C.J., and GIVAN, J., dissent with opinions.

SHEPARD, Chief Justice, dissenting.

I cannot agree with the majority's decision to dismantle *part* of the settlement agreement and order of the Utilities Regulatory Commission. These were laboriously crafted in 1986 to deal with the financial emergency arising out of the cancellation of the Marble Hill nuclear project. The settlement agreement which the Commission approved was the subject of intense negotiations between Public Service Company of Indiana and the Utility Consumer Counselor. The Citizens Action Coalition participated in some of the discussions but did not join in the agreement.

The agreement included a variety of measures affecting PSI's capital base and rates, detailed in some fifteen paragraphs. Some of these measures placed burdens on the company's shareholders, who wrote off their investment in Marble Hill without litigating whatever statutory or constitutional claims for recoupment the company may have had. Other parts of the 1986 agreement and order protected consumers: PSI was barred for three years from seeking rate increases.

There was widespread recognition that the 1986 order represented a difficult solution to a series of events which had no precedent. The order was not universally applauded as equitable or legal, of course, and the parties now before us sought to set it aside through the process of judicial review. These parties elected not to challenge that portion of the order which is presently at issue; they chose instead to challenge other provisions of the 1986 order. The courts heard these challenges and affirmed the decision of the Commission. *Citizens Action Coalition v. Public Serv. Co. of Indiana* (1990), Ind.App., 552 N.E.2d 834, *trans. denied*.

After Congress enacted the Tax Reform Act of 1986, the Commission set about determining how utility rates in the state should be adjusted downward to reflect the lower corporate tax rates which that Act provided. The Commission noted that a few utilities were in the midst of ratemaking when the Act was passed, and it elected not to review the rates of those utilities whose rates had already been set by taking tax rate reductions into account. When the Commission acted on June 1, 1987, to set new rates for a great many utilities, it noted in effect that its 1986 order for PSI had taken tax rate reductions into account and that there was no need for further review. Record at 228.

Five years after the accommodation reached in 1986, an accommodation affirmed by the state's courts, the majority of this Court takes one piece out of the package and leaves the rest. In effect, the majority orders the Commission to restructure the settlement after the fact by vacating just one of its provisions, the one governing recovery through the tax system of part of the $1.6 billion which shareholders spent and lost on Marble Hill.

The 1986 proceeding and the settlement and order which brought it to a close presented a host of issues which the company and the Consumer Counselor might well have hoped to resolve on more favorable terms. Was the emergency rate relief inadequate or too generous? Did the Commission have any authority to prohibit a utility from seeking future rate increases? Were the facts surrounding the construction of Marble Hill sufficiently different to

present constitutional questions the outcome of which might be different than those raised and resolved in *NIPSCO I?* Issues such as these were debated, negotiated, and settled. The contending parties each gave something and received something in the course of devising a solution to the financial disaster of Marble Hill. Those who believed the settlement was illegal and unjust challenged the solution, and the judiciary rejected the challenge.

The Public Counselor has done an honorable thing in standing by his 1986 agreement. By dismantling only a part of that agreement, this Court imposes a new hit on the company's shareholders while binding them to their 1986 relinquishment of their legal rights. This is a late hit after the whistle, and it is not fair play.

GIVAN, Justice, dissenting.

I dissent from the majority opinion in this case in their basic holding that the appellants may assert grounds on appeal which were not raised before the Public Service Commission.

The Court of Appeals decision in this case, reported at 556 N.E.2d 328 in a well-written opinion authored by Judge Garrard, has pointed out why the availability of appeal under Ind.Code § 8–1–3–1 does not give the appellant *carte blanche* to present questions to the Court of Appeals which were not presented to the Commission.

Judge Garrard correctly points out that to do so would require the Court of Appeals to hold a *de novo* hearing concerning matters which had never been presented for the Commission's consideration. Any appeal, whether it be from a trial court or an administrative board, should be concerned only with what was presented to the finder of fact and its decision thereon. To hold otherwise creates a nearly impossible situation for orderly appellate adjudication.

The excellent opinion by Judge Garrard needs no further comment or explanation. I would deny transfer in this case.