CITIZENS ACTION COALITION OF INDIANA, INC.; City of Terre Haute; Save the Valley, Inc.; and Office of the Utility Consumer Counselor, Appellants–Intervenors Below,

v.

PUBLIC SERVICE COMPANY OF INDIANA, INC.; Industrial Energy Consumers Group; Nucor Corporation; General Motors Corporation; Wabash Valley Power Association; and Designated Industrial Consumers of Energy, Appellees–Petitioners and Intervenors Below.

No. 93A02–9004–EX–242.

Court of Appeals of Indiana,
Third District.

April 19, 1993
Transfer Denied July 29, 1993.

Michael A. Mullett, Indianapolis, for appellant Citizens Action Coalition of Indiana.

Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, for appellant City of Terre Haute and Save the Valley, Inc.

James L. Turner, Utility Consumer Counselor, Robert K. Johnson, Deputy Consumer Counselor, Office of Utility Consumer Counselor, Indianapolis, for appellant Utility Consumer Counselor.

Stanley C. Fickle, David F. Hamilton, Barnes & Thornburg, Indianapolis, Cheryl M. Foley, Ronald J. Brothers, PSI Energy, Inc., Plainfield, for appellee Public Service Co. of Indiana, Inc. (now called PSI Energy, Inc.)

Linley E. Pearson, Atty. Gen., Kirk A. Knoll, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis (Colleen F. McNenny, Ind. Utility Regulatory Comm., of counsel), for amicus curiae Ind. Utility Regulatory Comm.

HOFFMAN, Judge.

This case stems from PSI's March 1989 petition for approval of permanent rates, redocketed as Cause No. 37414–S2, and PSI's June 1989 petition for approval of proposed retail rate-making related to the sale of interim power to Wabash Valley Power Association, Cause No. 38809. In July 1989, the causes were consolidated. Public hearings were held in September, November and December 1989. On April 4, 1990, the Indiana Utility Regulatory Commission (IURC) issued its order which contained a fair rate of return range, rather than setting a specified rate of return.

As restated, appellants (collectively ratepayers),[1] urge that:

1. The IURC's order is not based upon sufficient evidence in the record;
2. The order is based in part upon speculation; and
3. The IURC improperly allowed a "sliding scale incentive" return to PSI.

In the portion of the order regarding quantification of PSI's cost of equity, the IURC stated:

"Finally, there is the clear need for [PSI] to continue to rebuild its equity as a necessary (though by no means sufficient) condition of its receiving a bond rating upgrade to A from the present BBB or Baa—thereby reducing heavy future borrowing costs which would have to be met by ratepayers. This suggests to us the concomitant need for greater flexibility in fixing a cost of equity figure than we have heretofore accorded Indiana utilities. In this connection, while we have questioned much of Mr. Benderly's [PSI's witness] analysis, we concede that his analysis on the whole is forward-looking, to that point in time where PSI would hope to be by the end of the life of the rates to be established in this Cause, yet adjusted to the company's present financial situation. Mr. Kahal [Utility Consumer Counselor's witness], by contrast related PSI's cost of capital to companies with similar bond ratings without consideration to dissimilarities and circumstances which may or may not be peculiar to PSI. Yet it is also true that both PSI and its adversaries have presented reasoned and logical arguments for their respective positions as to PSI's cost of equity, as our discussion of the record should show. In consideration of the uniqueness of PSI's current circumstances and the future demands upon its ability to raise capital at reasonable rates, and recognizing that true comparison groups are unavailable to us (and for that matter, not defined by the record), we conclude that a unique approach to setting PSI's cost of equity is required." [Order 32]

The IURC derives its rate-making authority solely from statute, and unless a grant of power and authority can be traced to a statute, it must be concluded that no authority exists. *See Citizens Action v. Northern Indiana Public* (1985), Ind., 485

---

[1] Appellants Citizens Action Coalition, Terre Haute, and Save the Valley filed a Joint Brief of Appellants. A separate Brief of Appellant was filed by the Utility Consumer Counselor. The dispositive issues have been grouped together as composite issues from both sets of briefs.

N.E.2d 610, 612 (*NIPSCO* I). Although an order is presumed valid, unless clearly not, such presumption vanishes if relevant statutes, standards and legal principles are not adhered to by the IURC. *Id.* A multiple-tier standard of review is applicable to the IURC's orders. *Id.* A court on review must inquire whether specific findings exist as to all factual determinations material to the ultimate conclusions; whether substantial evidence within the record as a whole supports the findings of fact; and whether the decision, ruling, or order is contrary to law. *Id.* at 612–613.

"The Commission's [now IURC] primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors."

> *L.S. Ayres & Co. et al. v. IPALCO et al.* (1976), 169 Ind.App. 652, 351 N.E.2d 814, 819;
>
> *see also* IND.CODE § 8–1–2–4 (1984).

This Court and our Supreme Court have noted that a "simple mathematical formula for the expression of a utility's total revenue requirement" can be stated as:

> "$R = O + (V - D) r$
>
> where R is the total revenue required,
>
> O is the operating costs,
>
> V is the gross value of the tangible and intangible property,
>
> D is the accrued depreciation of the tangible and reproducible property,
>
> and r is the rate of return."

*Citizens Action Coalition v. PSI* (1991), Ind., 582 N.E.2d 330, 336, *quoting City of Evansville v. So. Ind. Gas* (1975), 167 Ind. App. 472, 482 n. 7, 339 N.E.2d 562, 570 n. 7, *quoting* C. Phillips, The Economics of Regulation 131 (1965).

The IURC specifically rejected traditional cost of capital methodology. The order reveals two paramount factors which, in the view of the IURC, prompted the "unique approach" to rate-making in the present case: PSI's precarious financial condition and the potential impact of "acid rain" legislation which the IURC believed would become effective in the future. However, the IURC may not explicitly and implicitly reject the evidence in the record to fashion a unique remedy. Further, findings may not be based upon speculation.

The IURC adopted "cost of equity" as a component of its determination of PSI's fair rate of return. The IURC found that only three witnesses provided evidence regarding the cost of equity. Witnesses Kahal and Thomas fixed PSI's cost of equity at 13.0% and 13.85% respectively. PSI's witness, Benderly, testified that PSI's cost of equity could be as high as a range of 16.2% to 16.45%, if the IURC adopted PSI's proposed rate moratorium. The IURC specifically rejected the rate moratorium. Absent the rate moratorium, Benderly testified that PSI's cost of equity would be 15.2%. The IURC found that PSI's cost of equity "falls within a range of 14.0% to 16.0%." [Order 32]

As argued by ratepayers, the record does not support such a range. Once the rate moratorium was rejected by the IURC, the testimony by PSI's witness would support only a 15.2% cost of equity at most. Consequently, the IURC erred in fixing the cost of equity component at a range of 14.0% to 16.0%.

■ Next, ratepayers complain that the IURC improperly adjusted its measurement of PSI's cost of equity based upon speculation that acid rain legislation would be enacted in the future, thereby damaging PSI's investment potential. While the IURC correctly noted that evidence in the record indicates that PSI would "be one of the most heavily impacted utilities in the nation by any variant of the acid rain legislation now moving through the U.S. Congress," [Order 31] no such legislation existed at the time of the order. It is laudable that the IURC is not short-sighted when assessing factors which comprise the rate-making equation; however, the IURC's discretion lies in the area of assessing the impact of known circumstances. Forcing ratepayers to bear the weight of a calculation based upon speculation is not within the purview of the IURC's authority. The possibility of such legislation and its consequences demand the policy-making atten-

tion of the utility's management prior to its enactment, not the rate-making authority of the IURC. The adjustment for potential harm flowing from an uncertain event was error.[2]

■ Also, ratepayers contend that the IURC improperly allowed a "sliding-scale incentive" return to PSI which is not authorized by statute except in the event of an agreement by the parties. In its order, the IURC stated:

"We further find, that because the evidence of PSI's cost of capital lacks the reliability associated with the vast majority of cases, and because we have compensated for this lack of reliability by making the range an upward adjustment, that between earnings of 7.6% through 8.1% on PSI's fair value rate base, a 50–50 sharing with PSI's ratepayers should occur. Such a sharing arrangement should serve to provide benefits to both PSI and its ratepayers not associated with a fixed return as opposed to a range of returns. An incentive is provided Petitioner to increase sales and decrease costs so that earnings, initially established at the lower end of the range, may improve. As earnings improve, they will be shared with the ratepayers, which is a benefit to the ratepayers which would be absent were we to choose a single number within the range and fix that number as PSI's authorized return. Of course, we have found that the record does not suggest a single rate of return with any precision and find the sharing arrangement to be an equitable feature in our establishment of a range of authorized returns.

... [W]e are not here instituting what is generally known throughout the industry as 'incentive rates' to which it would be entirely appropriate to attach performance standards. As we have tried to make clear, we feel compelled by the inadequacy of the record to decline to settle upon a single number to represent

our finding on return on equity...." [Orders 41–42]

Although ratepayers have elaborately and convincingly argued the details of various statutes which would prohibit an incentive rate absent the agreement of a utility's customers, the IURC's finding is, on its face, without support in the record. The IURC's decision to allow PSI to retain 50% of its net operating income between $156,-070,000.00 and $166,338,000.00 is an incentive rate of return notwithstanding the IURC's statement otherwise. As noted above, some factors upon which the IURC made its calculations were faulty. Moreover, explicitly making a determination based upon a lack of evidence in the record thwarts review at the very least and cannot stand. The finding as to the incentive rate is error.

As noted by our Supreme Court in *PSI, supra,* "[t]his is nothing but a new head of Hydra ...," an attempt to do by one means what could not be accomplished through other "wrongful additional charge[s] placed on PSI ratepayers...." 582 N.E.2d at 336.

For the above-stated reasons, the cause is remanded to the IURC for further proceedings including a redetermination of cost of equity and its components.

Reversed and remanded.

GARRARD, J., concurs.

SULLIVAN, J., concurs and dissents with opinion.

SULLIVAN, Judge, concurring in part and dissenting in part.

I agree with the majority that with respect to PSI's cost of equity, the determination of IURC lacks evidentiary support. I further agree that the order is in other respects based upon impermissible speculation as to the possible impact of future acid rain legislation. I dissent, however, from the majority's categorical rejection of a sliding scale incentive with respect to the rate of return allowed.

---

**2.** As noted by ratepayers, the IURC stated that the assessment of investor expectations was reflected within the "bare-bones" cost of equity. However, it returned to the investor expecta-tions component within its upward adjustment for acid rain legislation. Because the adjustment was in error, no further discussion is required.

Had IURC fixed PSI's "reasonable rate of return" by resort to a cost of equity supported by testimony of record, reversal would not be justified. Here, however, as noted by the majority, the high end of the cost of equity range determined by IURC was 16.0%. That percentage has no support of record, given rejection of the rate moratorium as a viable consideration. The cost of equity determination, therefore, may not serve as the underlying basis for the rate of return allowed.

In this connection, appellees do not persuasively point to any other clear evidentiary underpinning for the rate allowed. To point to a generalized consideration of "all of the factors affecting a utility's financial condition", (Appellee PSI's Brief at 12) will not suffice; nor will speculative assessments of discounted cash flow or investor expectations. This is particularly so in light of a seemingly arbitrary upward adjustment of .50% for "issuance costs". Appellee PSI's Brief at 14.

In its treatment of the cost of equity issue, the majority understandably noted that the rate-making authority is derived solely from statute and unless such authority is found within the statute, "it must be concluded that no authority exists." Slip Opinion at 4. This observation is subject to the implication that IURC is precluded from utilizing creative and innovative approaches in meeting the needs of utilities and protecting consumers. Such creativity and innovation may be wholly appropriate, or even necessary, to deal with a particular situation and should not be rejected unless it runs afoul of statutory provisions or established case precedent.

That the statutes do not specifically make provision for a sliding scale, such as that here permitted, is not determinative, for neither do the statutes absolutely mandate the fixing of a single, immutable percentage for the rate of return for the three-year period involved. I, therefore, do not find *per se* objectionable IURC's fixing of a rate of return between 7.60% and 8.10%. So long as the formula for fixing a percentage upon the sliding scale at any particular time is clear and precise, it may be sanc-tioned as that approach to the allowable rate of return, which though creative and innovative is necessary under the particular circumstances of the case.

In so stating, however, I do not subscribe to that portion of the IURC order which suggests that an "incentive rate" may be premised upon "the inadequacy of the record" before the Commission.

Subject to the comments herein, I concur in the remand for redetermination.